**Opinion filed May 14, 2015**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00283-CR

_____

## JOE LOUIS TIENDA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 428th District Court**

**Hays County, Texas**

**Trial Court Cause No. 07-802**

### O P I N I O N

Joe Louis Tienda appeals his jury convictions for the offense of indecency with a child by sexual contact. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (c) (West 2011). Appellant was indicted on three counts of indecency with a child by sexual contact. The jury acquitted him of Count One and convicted him of Counts Two and Three. On Count Three, the jury assessed his punishment at confinement for a term of six years in the Texas Department of Criminal Justice, Institutional Division. On Count Two, the jury assessed his punishment at confinement for a term of ten

years and recommended that the punishment be suspended. Accordingly, the trial court suspended the imposition of Appellant's ten-year sentence of confinement and placed him on community supervision for a term of ten years.

In six issues on appeal, Appellant contends that (1) one of his convictions for indecency with a child should be set aside on double jeopardy grounds; (2) the evidence was insufficient to sustain his convictions; (3) the trial court erred when it admitted, as an excited utterance, the testimony of a school nurse regarding the child's statement to her; (4) the trial court erred when it admitted, as an excited utterance, an audio recording of an interview of the child taken by a police detective; (5) the trial court erred when it admitted out-of-court statements made by the child to the police detective as information relied upon by the detective in his investigation; and (6) the trial court erred when it allowed improper opinion testimony from the police detective. We reverse and remand.

*Background Facts*

Appellant was charged by indictment with three counts of indecency with a child by contact. In light of the jury's verdict, we direct our attention to Counts Two and Three. These two counts of the indictment alleged that Appellant engaged in sexual contact "by touching the buttocks of [S.D.] with his male sexual organ with the intent to arouse or gratify the sexual desire of [Appellant]." Count Two alleged the date of occurrence as "on or about" July 1, 2007, and Count Three alleged the date of occurrence as "on or about" August 1, 2007.

S.D. was a sixteen-year-old girl who lived with her mother and Appellant, her stepfather. In September of 2007, S.D. told Darelle Jordan, a school nurse, that some events happened over the summer between her and her stepfather that made her feel uncomfortable. Nurse Jordan testified that S.D. made the following report to her:

> She said he -- when her mother was not home and she was alone
> at the house, that he would sit next to her, close to her, put his hand near

2

her breast.[1] She would ask him to move his hand, he would refuse. He would joke, act like it was all in fun. She would have to actually remove herself from his presence in order to get him to leave her alone. She would try to retreat to her bedroom.

When she retreated to her bedroom, he followed her into the bedroom, he laid down in the bed next to her, he rubbed his pelvis and genital area on her, he laid on top of her. When he was doing that, she could feel his erect penis, it made her frightened and uncomfortable.

Nurse Jordan told S.D. that she would have to report these incidents to Child Protective Services (CPS). S.D. did not want Nurse Jordan to report anything. Nurse Jordan testified that S.D. was worried that, if Appellant was reported to authorities, it "might cause problems in their family, that financial support by [Appellant] would be missed by her family." Nevertheless, Nurse Jordan reported these events to CPS.

Scott Johnson, a detective with the San Marcos Police Department, received the report from CPS. He met with S.D. at her high school. Detective Johnson testified that he interviewed S.D. and recorded her statements about what had happened between her and Appellant. He testified that S.D. made the following report to him:

[S.D.] described activity which began in that summer proceeding [sic] that school year of 2007. What began as uncomfortable displays of affection on the part of [Appellant] where he began kissing her, which then evolved into further attempts to kiss on the mouth. She described him trying to kiss her using his tongue. She said that he began -- when he would embrace her, he would frequently brush his hand across her --

. . .

As I was saying, she described the defendant brushing his hand across her breast, making her feel very uncomfortable. She then described her efforts to try to avoid him by going into her room and staying in her room.

[1]Count One of the court's charge permitted the jury to find that Appellant engaged in sexual contact with S.D. by touching her breast with his hands with the intent to arouse or gratify his sexual desire. As noted previously, the jury acquitted Appellant of this offense.

She described [Appellant] coming into her room and lying in bed with her. And at times, on more than one occasion, lying on top of her in -- he was dressed in shorts. And she -- the action she described was him lying on top of her so that his genitals would be in contact through the clothing with her buttocks and him moving back and forth in a motion, and she also described feeling his erect penis through his shorts while he was doing that.

A portion of the audio recording of Johnson's interview of S.D. was admitted at trial as an excited utterance. In the portion of the audio recording admitted as evidence, S.D. said that Appellant would lie on top of her while she was lying on her stomach. She reported that Appellant would move "up and down" on her while lying on top of her and that she could feel his penis when he was doing this even though he was wearing shorts. S.D. stated to Detective Johnson that Appellant's penis was "hard" and that he did this "three times."

At the time of trial, S.D. was twenty years old. She was reluctant to testify against Appellant. The trial court issued a writ of attachment to secure her attendance at trial after she did not voluntarily comply with a subpoena. S.D. told the prosecutors prior to trial that she wanted the charges against Appellant dropped. When asked why she wanted the charges dropped, S.D. testified: "Because I felt like everything was fine in our family and I just wanted to just move on with my life and just, you know, be happy again." S.D. was hesitant to testify that Appellant had sexual contact with her. S.D. initially testified at trial that Appellant's penis was not hard on the occasions that he lay on top of her. She also testified that it was possible that what had happened was an accident or simply wrestling with Appellant. When confronted with the statements she made to Detective Johnson, however, S.D. testified that she told him the truth about what had occurred. S.D. also testified that she remembered telling Detective Johnson that she felt Appellant moving up and down when he was on top of her and she felt his hard penis on her "butt."

4

*Double Jeopardy and Sufficiency of the Evidence*

In his first issue, Appellant asserts a double jeopardy claim. He argues that he suffered multiple punishments for the same offense. Specifically, Appellant contends that he was convicted of two identical offenses "arising out of only one possible fact scenario." He asserts that there was evidence about only one occasion when Appellant's penis came into contact with S.D.'s buttocks. He supports this contention with the following comment that one of the prosecutors made during a bench conference concerning the State's compliance with *Brady v. Maryland*, 373 U.S. 83 (1963).

> But the meeting I had with [S.D.] there was no recantation. She confirmed everything she told to the detective was the truth. And then she went over, step by step, with me what it is the defendant had done to her.

> She made it clear that there were three separate occasions. And that what we had misinterpreted from her interview was that the penis to the buttocks happened three times and that it really only happened once. The first time was him getting in bed and holding her close and the second time was the penis to the buttocks and the third time was kissing and breast touching.

The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Among the protections afforded by this provision is the protection from multiple punishments for the same offense. *Langs v. State*, 183 S.W.3d 680, 685 (Tex. Crim. App. 2006). There are two variations of a multiple-punishments claim: (1) where there are both a greater and a lesser included offense and the same conduct is punished twice—once for the basic conduct and a second time for that conduct plus more—and (2) where the same criminal act is punished under two distinct statutes and the legislature intended the conduct to be punished

only once—such as causing a single death and being charged with both intoxication manslaughter and involuntary manslaughter. *Id.*

The State contends that Appellant waived his double jeopardy claim by not raising it in the trial court. We disagree. The State is correct that a double jeopardy claim generally must be raised in the trial court to preserve the error for appellate review. *See Gonzalez v. State*, 8 S.W.3d 640, 643–46 (Tex. Crim. App. 2000). Because of the fundamental nature of the double jeopardy protections, however, a double jeopardy claim may be raised for the first time on appeal or on collateral attack if two conditions are met: (1) the undisputed facts show that the double jeopardy violation is clearly apparent on the face of the record and (2) when enforcement of the usual rules of procedural default serves no legitimate state interest. *Langs*, 183 S.W.3d at 687; *Gonzalez*, 8 S.W.3d at 643.

Appellant's double jeopardy claim is essentially a challenge to the sufficiency of the evidence to show that he committed indecency with a child by sexual contact as alleged in Counts Two and Three of the indictment on multiple occasions. He asserts that, at most, the evidence only shows that he committed the act on one occasion. Based upon this assertion, he contends that two convictions for the same act constitute a double jeopardy violation. "A claim regarding sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so." *Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001); *accord. Proctor v. State*, 967 S.W.2d 840, 842 (Tex. Crim. App. 1998). Additionally, the grounds for considering a double jeopardy claim for the first time on appeal also apply to Appellant's claim because the alleged violation would be clearly apparent on the face of the record and no legitimate state interest would be served by not considering Appellant's claim. *Gonzalez*, 8 S.W.3d at 643.

We review a sufficiency of the evidence issue, regardless of whether it is denominated as a legal or factual claim, under the standard of review set forth in

*Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

Appellant bases his "one possible factual scenario" contention on S.D.'s live trial testimony. In this regard, S.D. testified that she only remembered one time that Appellant lay on top of her. Appellant supports this contention with the comment made by the prosecutor during a bench conference. We first note the prosecutor's comment does not constitute evidence, particularly given the fact that it was during a bench conference when the jury was not present in the courtroom. Appellant's evidentiary contention ignores the other items of evidence pointing to Appellant committing the alleged act on multiple occasions. In the portion of S.D.'s statement to Detective Johnson that was played for the jury, she stated that Appellant lay on top of her three times in her room with his penis making contact with her buttocks.

7

She stated in the interview that "he was moving the three times I caught him." Detective Johnson also testified that the charged conduct happened "on more than one occasion" in describing what S.D. had reported to him.

"A person who commits more than one sexual act against the same person may be convicted and punished for each separate and discrete act, even if those acts were committed in close temporal proximity." *Aekins v. State*, 447 S.W.3d 270, 278 (Tex. Crim. App. 2014). The events that S.D. reported to Detective Johnson constitute evidence that Appellant committed the alleged act on multiple occasions. The fact that Appellant challenges the admissibility of these items of evidence does not affect our review of the sufficiency of the evidence because we are required to consider both admissible and inadmissible evidence under the applicable standard of review. Furthermore, it was within the jury's province to resolve any conflicts between S.D.'s live trial testimony and the events she reported to Detective Johnson, and we presume that the jury resolved those conflicts in support of the verdict. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Appellant committed the offense of indecency with a child by sexual contact on more than one occasion as alleged in Counts Two and Three. We overrule Appellant's first issue.

Appellant also challenges the sufficiency of the evidence in his second issue. A person commits the offense of indecency with a child by sexual contact if the actor touches any part of the body of a child, including touching through clothing, with the actor's anus, breast, or any part of the actor's genitals with the intent to arouse or gratify the sexual desire of any person. PENAL § 21.11(a)(1), (c)(2). As noted previously, Counts Two and Three of the indictment alleged that Appellant committed the offense of indecency with a child by sexual contact "by touching the buttocks of [S.D.] with his male sexual organ with the intent to arouse or gratify the sexual desire of [Appellant]." Appellant contends that the evidence was insufficient

8

to establish that he engaged in the alleged contact with the intent to arouse or gratify his sexual desire. He additionally contends that the evidence does not establish that sexual contact actually occurred because both S.D. and Appellant were clothed at the time of the incidents and because S.D. was covered with a blanket.

In a prosecution for indecency with a child, the defendant's specific intent to arouse or gratify his sexual desire can be inferred from his conduct, his remarks, and all surrounding circumstances. *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); *Moore v. State*, 397 S.W.3d 751, 754 (Tex. App.—San Antonio 2013, no pet.). Intent can be inferred from conduct alone, and no oral expression of intent or visible evidence of sexual arousal is necessary. *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd). Further, a complainant's testimony alone is sufficient to support a conviction for the offense of indecency with a child. *Moore*, 397 S.W.3d at 754; *Connell v. State*, 233 S.W.3d 460, 466 (Tex. App.—Fort Worth 2007, no pet.).

Much like with his contentions in support of his first issue, Appellant bases his challenge to the intent element on S.D.'s live testimony wherein she testified that, although she could feel Appellant's penis, it was not "hard." He also points out S.D.'s trial testimony wherein she testified that Appellant was possibly wrestling with her and that she did not believe his conduct was sexual in nature. In her reports to Detective Johnson and Nurse Jordan, S.D. stated that she could feel Appellant's erect penis when he climbed on top of her. Furthermore, S.D. testified that she "did tell the detective his penis was hard" and that her report to Detective Johnson was correct. Additionally, S.D. reported to Detective Johnson that Appellant was moving up and down when the contact occurred and that it happened on more than one occasion. Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt

that Appellant possessed the specific intent to arouse or gratify his sexual desire when engaging in the alleged conduct.

Appellant acknowledges that the definition of sexual contact includes "touching through clothing." PENAL § 21.11(c). He contends that sexual contact could not have occurred in this case, however, because there were multiple layers of clothing or fabric separating Appellant's penis and S.D.'s buttocks. We disagree. The statutory definition of sexual contact simply provides that it may occur through clothing—without reference to the number of layers of clothing or fabric separating the perpetrator and the victim. In *Resnick*, the court stated that the essence of the act of touching "is to perceive by the sense of feeling." *Resnick v. State*, 574 S.W.2d 558, 560 (Tex. Crim. App. [Panel Op.] 1978). Irrespective of the number of layers of fabric between S.D. and Appellant, S.D. testified that she could feel Appellant's penis on her buttocks when he lay on top of her. A rational trier of fact could have found beyond a reasonable doubt that Appellant touched her buttocks with his penis based upon her testimony that she felt his penis touching her buttocks. We overrule Appellant's second issue.

*Hearsay*

Appellant's third, fourth, and fifth issues concern the admissibility of out-of-court statements. We review a trial court's decision to admit evidence under an abuse of discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). We will uphold an evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006). We initially address Appellant's fourth issue in which he challenges the admission of portions of an audio recording of an interview with S.D.

Detective Johnson was the first witness called by the State. S.D. had made reports concerning allegations of sexual assault against Appellant, and CPS referred those allegations to Detective Johnson. The allegations concerned events that had

10

occurred a couple of months before he received the report. In September 2007, Detective Johnson met with S.D. in the school administration office. Although S.D. initially thought that Detective Johnson was there to talk with her about a missing cell phone, after he introduced himself and explained why he was there, he interviewed her about the sexual assault allegations.

Detective Johnson testified that S.D. became emotional at times during the interview and that he had to stop the interview a couple of times because S.D. began to cry. He answered affirmatively to the following question: "[D]id it seem to you that her emotional state and her breakdown was directly related to the information and the reliving of what she was telling you?" He additionally testified, "I felt like her emotional state was directly attributed to the trauma that she had experienced." Detective Johnson made an audio recording of the interview.

At trial, the prosecutor sought to admit the audio recording under the excited utterance exception to the hearsay rule as applied in *McCarty*. *See McCarty v. State*, 257 S.W.3d 238, 241–42 (Tex. Crim. App. 2008). The trial court recessed the trial in order to evaluate the applicability of the *McCarty* factors. The trial court and Appellant's counsel engaged in a lengthy discussion regarding the applicability of the *McCarty* factors, especially the factor that related to the elapsed time between a startling condition and an earlier event to which a declarant testified. Relying on *McCarty*, the trial court admitted a seven-minute portion of S.D.'s recorded statement under the excited utterance exception to the hearsay rule. *Id.*

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *see Sandoval v. State*, 409 S.W.3d 259, 281 (Tex. App.—Austin 2013, no pet.). Hearsay is inadmissible except as provided by statute or the Rules of Evidence. TEX. R. EVID. 802; *see Sandoval*, 409 S.W.3d at 281. Excited utterances are admissible as an exception to the hearsay rule. *See Sandoval*, 409 S.W.3d at 284.

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2); *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001); *see Sandoval*, 409 S.W.3d at 284.

The spontaneous nature of the statement is the main factor to be considered when a court determines the admissibility of an excited utterance. *Tezeno v. State*, 484 S.W.2d 374, 379 (Tex. Crim. App. 1972). The declarant must have made the statement before the excitement that is caused by the startling event or condition has abated. *Sandoval*, 409 S.W.3d at 284. This is so because the excited utterance exception is based on an assumption that the person making the statement is not then capable of the kind of reflection that would enable her to fabricate the information about which she testifies. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). The trustworthiness of the statement is founded on the fact that it is the event that speaks through the person and not merely the declarant relating the event. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). And, it is not necessary that the startling event be based on the original offense; the startling event may be a subsequent event, if it is in itself a startling event. *Sandoval*, 409 S.W.3d at 285. To be an excited utterance, the statement must be triggered by the shocking or startling event. *Id.*

In *McCarty*, the court laid out three conditions for a court to consider when it determines the admissibility of a hearsay statement under the excited utterance exception:

> (1) the "exciting event" should be startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication; and (3) the resulting statement should be sufficiently "related to" the startling event, to ensure the reliability and trustworthiness of that statement. *McCarty*, 257 S.W.3d at 241.

12

Appellant contends that the holding by the Austin Court of Appeals in *Sandoval* is controlling regarding the admissibility of S.D.'s interview with Detective Johnson under the excited utterance exception to the hearsay rule. Appellant's reliance on *Sandoval* is understandable because this case was transferred to us from the Third Court of Appeals in Austin pursuant to an order of the Texas Supreme Court under the authority of Section 73.001 of the Texas Government Code. TEX. GOV'T CODE ANN. § 73.001 (West 2013). In accordance with Rule 41.3 of the Texas Rules of Appellate Procedure, we are required to follow the precedent of the Austin Court of Appeals "unless it appears that the transferor court itself would not be bound by that precedent." TEX. R. APP. P. 41.3, comment to 2008 change.

The out-of-court statement that the trial court admitted as an excited utterance in *Sandoval* was made by a fifteen-year-old victim to her fifteen-year-old cousin. *Sandoval*, 409 S.W.3d at 270–74. Upon hearing the defendant's name mentioned during a conversation, the victim remarked that she did not like the defendant and asked her cousin, "Can I tell you something?" *Id.* at 285. After telling her cousin that she "was scared to tell anybody," the victim told her cousin that the defendant had sexually assaulted her by forcing her to have sexual intercourse with him. *Id.* at 270, 285. The cousin testified that, when the victim made the statement, she appeared to be under the emotions of what had happened to her. *Id.* at 285.

The Austin court held that the victim's statement to her cousin was not an excited utterance. *Id.* at 285–86. It determined that the record did not support a finding that the victim was still dominated by the excited state produced by the attack that had occurred three or four months earlier or that the mention of the defendant's name was the type of startling or shocking event contemplated by the excited utterance exception. *Id.* The court noted that the victim's age, the delay, her reluctance, and her contemplation of consequences all weighed against the

13

spontaneity requirement for the excited utterance exception to apply. *Id.* (citing *Apolinar*, 155 S.W.3d at 186). The court concluded that the victim's disclosure to her cousin was a narrative of a painful event, not an excited utterance. *Id.* at 286.

The sponsoring witness of the out-of-court statement in *Sandoval* was a minor. Thus, the admissibility of the statement was based upon a secondhand description from another minor about the victim's emotional state at the time of the statement. In the case now before us, the sponsoring witness was a veteran police detective. Furthermore, the trial court had S.D.'s actual voice to review in order to determine whether or not her statement to Detective Johnson constituted an excited utterance. We also have S.D.'s actual words to consider in determining whether the trial court abused its discretion when it determined that the admitted portion of her statement constituted an excited utterance. Accordingly, there are procedural differences between the facts in this appeal and those in *Sandoval*. Nevertheless, we conclude that the admitted portion of S.D.'s recorded interview, as in *Sandoval*, constituted a narrative of a painful event rather than an excited utterance.

Our task of reviewing the seven-minute portion of the audio recording admitted into evidence has not been easy. The portion admitted into evidence was not transcribed in the reporter's record either time it was played for the jury. Additionally, the initial recording supplied to our court with the reporter's record did not contain the portion of the interview played for the jury. We have subsequently obtained a complete copy of the interview, and we have carefully listened to the seven-minute portion played for the jury. Given the recess called by the trial court prior to determining that a portion of the recorded interview was admissible, we assume that the trial court also had the opportunity to listen to the interview prior to determining that it was admissible as an excited utterance.

In the admitted portion of the interview, Detective Johnson asked approximately twenty-six questions, several of which were leading. The admitted

portion of the interview can be broken down into two chronological sections for purposes of our analysis. In the first section, S.D. answered Detective Johnson's questions in a calm and direct manner with no hesitation. The admitted portion (starting at the 23:58 mark) began with Detective Johnson asking S.D. whether Appellant had touched her vagina or bottom or whether he had asked her to touch or look at the private parts of his body. She replied "no" to both of these questions. Detective Johnson then asked S.D. about her report to a school nurse that "[Appellant] would lay on the bed with you and push his body against you." S.D. agreed that this report was "true." Detective Johnson then asked S.D. to tell him about what she had reported to the school nurse. She then gave a description of Appellant lying on top of her while she lay on her stomach in her bed.

The second section of the admitted portion of the interview begins at approximately the 25:50 mark of the interview. Detective Johnson asked S.D. what part of Appellant's body was touching her body. She replied by saying, "His penis, like I can feel it, and I told my mom this." S.D. began crying at this point in the interview. Detective Johnson then asked S.D., "And when you feel his penis, describe that to me what you are feeling?" S.D. replied, "Very uncomfortable." Detective Johnson then asked, "How specifically does his penis feel?" After approximately a forty-five second pause, S.D. replied, "Very uncomfortable, like he is not supposed to be doing that." S.D. appeared to continue to cry during this pause as evidenced by Detective Johnson asking her if she wanted him to find some tissue and asking her if she was okay. Detective Johnson then asked S.D., "Was his penis soft or was his penis hard?" Within a few seconds, S.D. replied, "[I]t was hard." Detective Johnson then asked S.D. if Appellant was "just laying there or was he doing more than just laying on top of you?" S.D. asked Detective Johnson for clarification by responding, "Like, was he moving?" After Detective Johnson replied in the affirmative, S.D. replied, "Like I caught him three times doing that."

15

S.D. paused during the middle of this response, and she appeared to be continuing to cry. Detective Johnson then asked S.D. for clarification as to how Appellant was moving. S.D. initially replied that Appellant was moving "up and down." However, she did not complete her response until approximately one minute later after Detective Johnson prompted her to provide a response after which she stated that Appellant "would go like up on me and then he would go back down." The admitted portion of the interview concluded with Detective Johnson asking clarification questions about what Appellant might have said during these events. S.D. also stated that, on at least one occasion, she called for her mom to come to her room.

As noted previously, S.D. answered the questions during the first section of the admitted portion of the recorded interview quickly, directly, and calmly. None of the questions during the first section appeared to create an emotional state that led to an immediate, impulsive, or spontaneous response. Accordingly, the trial court abused its discretion when it concluded that the first section of the recorded interview constituted an excited utterance. *See McCarty*, 257 S.W.3d at 241–42; *Apolinar*, 155 S.W.3d at 186–87; *Zuliani*, 97 S.W.3d at 595–96.

The second section of the admitted portion of the recorded interview presents a more difficult question because of the emotions exhibited by S.D. in her responses to Detective Johnson's questions. The difficulty arises when we consider the statement of the Court of Criminal Appeals in *Zuliani* that "[t]he critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." 97 S.W.3d at 596 (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992) overruled on other grounds by *Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994)). There is no question that S.D. was dominated by emotions during the second section of the interview. However, emotional domination alone is not sufficient to constitute an excited utterance. Immediately after the sentence from

16

*Zuliani* quoted above, the Court of Criminal Appeals wrote: "Stated differently, a reviewing court must determine whether the statement was made 'under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.'" *Zuliani*, 97 S.W.3d at 596 (quoting *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)). The court subsequently noted in *Apolinar* that the excited utterance exception is "based on the assumption that the declarant is not, at the time of the statement, capable of the kind of reflection that would enable him to fabricate information." *Apolinar*, 155 S.W.3d at 186 (citing *Zuliani*, 97 S.W.3d at 595).

As we noted above, most of S.D.'s critical responses in the second section of the recorded interview were preceded by relatively long pauses. When we consider the *McCarty* factors to which we have already referred, we are constrained to hold that the long pauses in S.D.'s responses during the second section of the reported interview preclude a determination that her statements "resulted from impulse rather than reason and reflection." *Zuliani*, 97 S.W.3d at 596 (quoting *Fowler*, 379 S.W.2d at 347) (internal quotation mark omitted). While her responses were obviously emotional, they were not spontaneous enough to avoid the possibility of fabrication as required by *McCarty*. *See McCarty*, 257 S.W.3d at 241. Accordingly, the trial court abused its discretion when it determined that the admitted portions of the audio recording of the second section of S.D.'s interview with Detective Johnson were admissible under the excited utterance exception to the hearsay rule.

On appeal, the State contends that the admitted portion of S.D.'s recorded interview was not hearsay under TEX. R. EVID. 801(e)(1)(B) because it contained a prior consistent statement that was offered to rebut a claim of recent fabrication. We disagree. Rule 801(e)(1)(B) gives substantive, non-hearsay status to prior consistent statements of a witness proffered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. *Hammons v. State*,

17

239 S.W.3d 798, 804–05 (Tex. Crim. App. 2007). There are four requirements that must be met for prior consistent statements to be admissible: (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent; (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *Id.* In this case, Appellant did not challenge S.D.'s in-court testimony. Instead, Appellant challenged S.D.'s initial reports of the allegations as being fabricated. Accordingly, S.D.'s report to Detective Johnson was not a prior consistent statement when compared to her in-court testimony. If anything, it was a prior inconsistent statement when compared to her in-court testimony.

Appellant's third issue also concerns the excited utterance exception. Appellant asserts that the trial court erred when it allowed Nurse Jordan to testify about the allegations that S.D. reported to her. As noted previously in this opinion, Nurse Jordan provided a summation of the details that S.D. had related to her during their meeting. The prosecutor prefaced the offer of this testimony with the following questions asked of Nurse Jordan:

> Q. Now, when she started, at some point did she tell you about the actual acts that her stepfather had done to her?
>
> A. Yes.
>
> Q. Okay. And when she started to tell you about those acts, did you notice any, sort of, change in her emotional state?
>
> A. It was difficult for her to speak of these things. She was -- her voice became quieter, her head, kind of -- you know, she -- it was difficult. You know, it was not a conversation about, what are you going to have for lunch, it was a hard conversation about uncomfortable

things. And she became quiet, there were a few tears. She wasn't sobbing, but definitely emotional during that time.

Q. Okay.

A. And, you know, it was -- it's a difficult conversation, it was difficult for her.

Q. So would you say that the stress of having to talk about those events was causing her some emotional distress?

A. Yes.

Q. And you could visibly see that?

A. Yes, there were tears.

Unlike the situation involving the audio recording of S.D.'s actual voice, the trial court only had Nurse Jordan's secondhand account of S.D.'s emotional state at the time she reported the allegations. Although Nurse Jordan testified that "there were a few tears," S.D. was not sobbing. We conclude that the trial court abused its discretion by admitting Nurse Jordan's summation as an excited utterance in the absence of evidence that S.D. was dominated by emotion at the time of the report, coupled with the delay between the conduct and her statement about it to Nurse Jordan.

The State also contends that S.D.'s report to Nurse Jordan was admissible under TEX. R. EVID. 803(4) as a statement for the purpose of medical diagnosis or treatment. We disagree. In order for a statement to be admissible under Rule 803(4), it must be pertinent to diagnosis or treatment. *Taylor v. State*, 268 S.W.3d 571, 591 (Tex. Crim. App. 2008). Nurse Jordan testified that she visited with S.D. because a school counselor who had started talking with S.D. had another appointment. Nurse Jordan took over for the school counselor "to finish the conversation to have

my arm around her shoulder kind of thing." There simply was no testimony that S.D. made the statement to Nurse Jordan for the purpose of medical diagnosis or treatment.

The State additionally contends that Nurse Jordan's summation either was not hearsay under TEX. R. EVID. 801(e)(1)(B)—because it was a prior consistent statement offered to rebut a claim of recent fabrication—or was admissible under TEX. R. EVID. 803(24) as a statement against interest. We will address these additional contentions below.

Appellant's fifth issue addresses the admissibility of Detective Johnson's summation of the allegations that S.D. reported to him. The State sought to offer the summation as "information that [Detective Johnson] used for going to the next step in [his] investigative process." Appellant cites *Sandoval* for the proposition that Detective Johnson's summation exceeded the permissible bounds of out-of-court statements about which a police officer may testify as "information acted upon" in his investigation. *Sandoval*, 409 S.W.3d at 281–83. We agree. It is not a violation of the hearsay rule for a trial court to admit out-of-court statements that are offered to explain the reason that a defendant became a suspect in an investigation. *Id.* at 281–82. An officer should be allowed to testify as to the reasons for his behavior, his presence, and his conduct so that his involvement does not appear to have been simply by happenstance. *Schaffer v. State*, 777 S.W.2d 111, 114–15 (Tex. Crim. App. 1989). The statement, however, must be a general one and not one in which the officer gives specific details of the information received. *Sandoval*, 409 S.W.3d at 282.

The police officer in *Sandoval* gave a "complete account" of the victim's description of the sexual assault as "information he acted upon." *Id.* at 282–83. On appeal, the court determined that the officer's testimony was not merely a generalized description of possible criminality that explained how the defendant

20

came to be a suspect but, rather, contained specific details about the alleged sexual assault that he obtained from interviewing the victim and her mother and from reading their written statements. *Id.* at 283–84. The court held that the officer's testimony constituted hearsay evidence that went far beyond the permissible general description of information received about possible criminality and, instead, provided specific details and descriptions of the defendant's involvement in the sexual assault. *Id.* at 284. As was the case in *Sandoval*, Detective Johnson's summation of S.D.'s allegations against Appellant also provided specific details rather than a generalized description of criminality. Accordingly, his summation of S.D.'s allegations exceeded the permissible bounds of background information from a police officer.

As was the case with Nurse Jordan's summation of S.D.'s report to her, the State contends that Detective Johnson's summation was either a prior consistent statement offered to rebut a claim of recent fabrication under Rule 801(e)(1)(B) or a statement against interest under Rule 803(24). We disagree with both contentions. We previously have determined that S.D.'s report to Detective Johnson was not admissible under Rule 801(e)(1)(B) as a prior consistent statement of a witness. The same rationale applies to S.D.'s statement to Nurse Jordan.

The State cites *Glover v. State*, 102 S.W.3d 754, 766 (Tex. App.—Texarkana 2002, pet. ref'd), for the proposition that S.D.'s reports to Nurse Jordan and Detective Johnson were admitted as statements against S.D.'s social interest. *Glover* involved a fourteen-year-old girl who disclosed to her mother that she was a willing participant in sexual relations with a twenty-six-year-old man. 102 S.W.3d at 766. The court concluded that the statement was against the victim's social interest because it would "subject her to disgrace in the eyes of her mother." *Id.* Unlike the declarant in *Glover*, S.D. was not a willing participant in the instances of Appellant's sexual contact. Accordingly, S.D.'s reports of Appellant's conduct would not have

made her "an object of hatred, ridicule, or disgrace" as was the case in *Glover*. *See* TEX. R. EVID. 803(24); *Glover*, 102 S.W.3d at 766.

We have determined that the admitted portions of S.D.'s recorded interview and Nurse Jordan's and Detective Johnson's summations of S.D.'s reported allegations constituted hearsay and that no offered exceptions exist to allow for their admission. We now must determine whether the admission of this hearsay evidence was harmless.

The violation of an evidentiary rule that results in the erroneous admission of evidence constitutes nonconstitutional error. *See* TEX. R. APP. P. 44.2(b); *Geuder v. State*, 142 S.W.3d 372, 376 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). As nonconstitutional error, we must review the erroneous admission under Rule 44.2(b) of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 44.2(b); *see Campos v. State*, 317 S.W.3d 768, 779 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (the erroneous admission of a hearsay statement constitutes nonconstitutional error). When an appellate court applies Rule 44.2(b), it must disregard a nonconstitutional error unless the error affects the appellant's substantial rights. *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). An appellate court should not overturn a criminal conviction for nonconstitutional error "if the appellate court, *after examining the record as a whole*, has fair assurance that the error did not influence the jury, or influenced the jury only slightly." *Id.* (quoting *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001) (internal quotation mark omitted). Our focus is "not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict." *Id.* at 93–94; *See Kinsey v. State*, No. 11-12-00102-CR, 2014 WL 2459690, at \*12 (Tex. App.—Eastland May 22, 2014, no pet.) (mem. op., not designated for publication). The appellate court is to review the entire record in an effort to determine the effect

that the wrongfully admitted evidence had on the verdict. *Barshaw*, 342 S.W.3d at 93–94; *Kinsey*, 2014 WL 2459690, at \*12.

When we determine the effect that the wrongfully admitted evidence had on the verdict, we consider all the evidence that was admitted at trial, the nature of the evidence that supports the verdict, the character of the alleged error, and how the evidence might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94. Further, we may consider the trial court's instructions to the jury, the theories advanced in the case by the parties, closing arguments, jury voir dire, and the extent to which the State emphasized the error. *Id.*; *see also Kinsey*, 2014 WL 2459690, at \*12.

A conviction must be reversed for nonconstitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. "Grave doubt" means that, in the judge's mind, the question is so evenly balanced that he feels that he is in virtual equipoise as to the harmlessness of the error. *Barshaw*, 342 S.W.3d at 94. If such a grave doubt exists as to a defendant, then the defendant must prevail. *Id.*

We initially note that Nurse Jordan's and Detective Johnson's summations referenced the allegation that Appellant touched S.D.'s breast. These portions of the summations obviously did not influence the jury because Appellant was acquitted of that charge. However, the remaining portions of the summations contained the same allegations that were referenced in the inadmissible portion of S.D.'s recorded interview that was played for the jury.

Any error in admitting these items of hearsay is harmless if other evidence proving the same facts was properly admitted elsewhere. *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *Land v. State*, 291 S.W.3d 23, 28 (Tex. App.—Texarkana 2009, pet. ref'd). Accordingly, we focus on the remaining evidence offered at trial. We primarily focus our analysis on S.D.'s trial testimony.

On direct examination, S.D. testified that Appellant "would come to [her] room and lay next to [her]. You know, I would tell him to leave." This report, coupled with the report to her mother about Appellant hugging her and touching her breast, led to S.D. moving to her aunt's house for the summer. When S.D. moved back to her mother's house, she requested her mother to put a lock on her door for the following reason: "That way I have my own privacy. And I'll feel safer for me, you know, for my protection." However, S.D. also admitted telling Detective Johnson that the lock was placed on her door because of Appellant and that this statement to Detective Johnson was "the truth."

The following dialogue occurred when the prosecutor asked S.D. whether Appellant ever made her feel uncomfortable:

> A. Just the times that, you know, where -- he came in my room when my mom wasn't home and, you know, he would come in. You know, I would tell him, "I don't want you in my room. If my mom's not here or anybody's not in the house, I would like it if you would just leave my room." I said that that would make me feel better. And he would leave my room until my mom got back home from work, which would probably [be], like, around 3:00 or 2:00.
>
> Q. Okay. Was there ever a time where he laid in bed with you?
>
> A. Just once.
>
> Q. What did he do that time, that you remember? What did he do?
>
> A. He would lay next to me and hug me. And, you know, I would tell him -- I said, "I don't feel right. Can you just leave my room, please?" And, you know, he would leave my room. Every time I would tell him leave my room, he would leave my room.
>
> Q. So there were times where he would come get in your bed and hug you in your bed?

A. Not all the time.

Q. Were there sometimes that he did that?

A. Sometimes, but, like, not all the time.

S.D. subsequently described one instance when Appellant lay on top of her in her bedroom. She initially testified at trial that she felt Appellant's penis, but she denied that it was hard. However, she confirmed that she felt Appellant moving up and down on her body and that she felt his penis on her "butt." S.D. also testified that "it happened" and that what she told the police was true "[o]n certain parts." S.D.'s direct examination concluded with her admitting that she told Detective Johnson that Appellant's penis was hard and that her statement to that effect was true.

Although S.D. testified that she only remembered one instance of Appellant touching her with his penis, she also testified that she told the truth during her police interview. However, we have held that the only evidence of what she actually told Detective Johnson about any criminal conduct constituted inadmissible hearsay. Although S.D. testified that there was more than one time that Appellant got in her bed and hugged her, that testimony does not pertain to the charged criminal conduct. Accordingly, when we eliminate the audio recording and Nurse Jordan's and Detective Johnson's summations, there was no other evidence from any other source to establish that Appellant committed the conduct on more than one occasion; he was convicted for committing such conduct on more than one occasion. Further, the jury, on more than one occasion, heard the audio recording and S.D.'s voice on it. Additionally, in argument, the prosecutor emphasized the contents of the inadmissible portions of the audio recording. Under this record, we cannot say that we have fair assurance that the error did not influence the jury or that the error

influenced the jury only slightly. Accordingly, we sustain Appellant's third, fourth, and fifth issues.

## *Opinion Testimony*

In his sixth issue, Appellant argues that the trial court erred when it allowed Detective Johnson to offer his opinion regarding Appellant's role in S.D.'s absence at the start of trial. In light of our disposition of Appellant's third, fourth, and fifth issues, we need not address Appellant's sixth issue.

## *This Court's Ruling*

We reverse the judgments of conviction on Counts Two and Three and remand the cause to the trial court for a new trial on those two counts.

JOHN M. BAILEY
JUSTICE

May 14, 2015

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.