**Opinion filed February 2, 2017**



## In The

# Eleventh Court of Appeals

_____

## No. 11-15-00007-CR

_____

## JAIME JOSHUA SALAZAR, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR42162**

### M E M O R A N D U M   O P I N I O N

Jaime Joshua Salazar appeals his jury convictions for aggravated sexual assault of a child younger than fourteen years of age and indecency with a child by contact. *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011), § 22.021(a)(1)(B)(i) (West Supp. 2016). The jury assessed Appellant's punishment at confinement for a term of fifteen years in the Institutional Division of the Texas Department of Criminal Justice for the offense of aggravated sexual assault of a child and for a term

of five years for the offense of indecency with a child.  The trial court ordered that the sentences are to be served consecutively.  In two issues on appeal, Appellant asserts that the evidence presented at trial was insufficient to support his convictions. We affirm.

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd).  Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).  When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted.  *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded.  *Brooks*, 323 S.W.3d at 899.  This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778.  When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

In his first issue, Appellant challenges the sufficiency of the evidence supporting his conviction for aggravated sexual assault of a child.  A person commits the offense of aggravated sexual assault of a child if he intentionally or knowingly

"causes the penetration of the anus or sexual organ of a child by any means" and the victim is younger than fourteen years of age. PENAL § 22.021(a)(1)(B)(i), (a)(2)(B). Count I of the indictment charged Appellant with intentionally and knowingly causing the penetration of the sexual organ of D.M., a child younger than fourteen years of age, with "a finger."

In his second issue, Appellant challenges the sufficiency of the evidence supporting his conviction for indecency with a child by contact. A person commits the offense of indecency with a child by contact if, "with a child younger than 17 years of age," a person "engages in sexual contact with the child or causes the child to engage in sexual contact." *Id.* § 21.11(a)(1). The Penal Code defines "sexual contact" as "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child" or "any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person" committed with the intent to arouse or gratify the sexual desire of the person. *Id.* § 21.11(c). Count II of the indictment charged Appellant with engaging in sexual contact with D.M., a child younger than seventeen, by touching D.M.'s breast with the intent to arouse and gratify the sexual desire of Appellant. An intent to arouse or gratify an accused's sexual desire can be inferred from conduct, remarks, and all surrounding circumstances. *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981). Intent can be inferred from conduct alone, and no oral expression of intent or visible evidence of sexual arousal is necessary. *Tienda v. State*, 479 S.W.3d 863, 873 (Tex. App.—Eastland 2015, no pet.).

Appellant's convictions arise from sexual acts alleged to have occurred with his eleven-year-old stepdaughter, D.M. D.M and her mother, L. Salazar, had lived

with Appellant for ten years. Appellant and Salazar[1] have three children together. Salazar also has two children from previous relationships, including D.M. Salazar testified that Appellant had been trying to adopt D.M.

On April 4, 2013, D.M.'s fifth grade teacher, Natalie Ruth Hawks, noticed that D.M. was crying while looking out the window of the school cafeteria. Hawks went to check on D.M. because she had never seen D.M. cry before. Hawks asked D.M. what was wrong, and D.M. had a hard time responding. D.M. appeared to be distraught and told Hawks that everything was not alright at home. Hawks testified that D.M. told her that "the man that lived in [D.M.'s] house was touching her in bad places." Hawks then immediately took D.M. to the school counselor's office. On the way to the counselor's office, D.M. told Hawks that she did not want her mother to find out because her mother was going to be mad.

D.M.'s counselor contacted the Midland Police Department and informed the police of a possible sexual assault of a child. Miranda Chavez, a Midland County sheriff's deputy, arrived at the school and took a statement from Hawks. After interviewing Hawks, Deputy Chavez took D.M. to the Children's Advocacy Center in Midland. Deputy Chavez testified that D.M. was very quiet and appeared to be nervous. Upon arriving at the Children's Advocacy Center, Deputy Chavez left D.M. with the employees there and Sergeant Chris Fuentes of the Midland County Sheriff's Office.

Mary Maez, a forensic interviewer at the Children's Advocacy Center, conducted a forensic interview of D.M. This was the first of two interviews that Maez conducted of D.M. Recordings of both interviews were offered into evidence, and portions of both of them were played for the jury. With respect to the first interview, Maez testified that D.M. understood the difference between telling the

---

[1]We will refer to D.M.'s mother as "Salazar" in this opinion.

truth and telling a lie. She stated that D.M. was scared at the beginning of the interview and that, as the interview progressed, D.M. became very emotional and cried. During this first interview, D.M. said that her "dad keeps touching [her] in the wrong spots he is not supposed to." D.M. identified Appellant as her stepfather, although she referred to him as her "dad" during the interview.

D.M. stated that Appellant touched her breasts, her "private part," and her "butt." By "private part," D.M. was referring to her vagina. D.M. circled the breasts, buttocks, and genital area on an anatomical drawing of a girl to further identify the areas where Appellant touched her. D.M. said that Appellant touched her in those spots on a Saturday night in March after spring break while she was on her bed sleeping. D.M.'s clothes were on when Appellant touched her skin on her "private part" with his fingers. D.M. stated that Appellant put one of his fingers "inside of that thing where your baby is born."

According to D.M., Appellant was mad at Salazar when he went into D.M.'s room in his boxers and started touching her after lying down next to her. D.M. said that Appellant never lies down with her or her sisters. When D.M. woke up and saw Appellant, he had his hand under her shirt, but he removed it. After removing his hand, Appellant acted like he was sleeping, but once D.M. turned around, Appellant put his hand back in her shirt. Appellant then "stuck his hand in [her] private part" and "made it hurt." D.M.'s mother then entered the room and asked Appellant when he was going to bed, and Appellant responded, "[I]n a minute." D.M.'s mother left, and Appellant removed his hand from D.M.'s private part and then proceeded to touch her "butt" and her breasts again before leaving the room. D.M. said that this was the first time conduct of this type had occurred and that nothing had happened since. Maez testified that there were no signs of coaching or manipulation of D.M. during the first interview.

On the same day as the first interview, Donna Doyle conducted a sexual assault nurse examination on D.M. at Midland Memorial Hospital. Doyle asked D.M. why she was at the hospital, and D.M. replied, "My dad has been touching me in wrong spots." According to Doyle, D.M. identified her "wrong spots" by pointing to her "breast, female sexual organ, and the anus, anal area." D.M. told Doyle that Appellant touched her with his hands on a Saturday after spring break in March and that it lasted a while. Doyle did not find any injuries on D.M. However, Doyle testified that she did not expect to find any injuries as a result of digital penetration.

After the initial interview with D.M., Sergeant Fuentes talked with D.M.'s mother, Salazar. Salazar told Sergeant Fuentes that D.M. had been known to lie, was "boy crazy," and had been known to leave the house. During this discussion, Salazar said that D.M. was on the honor roll but was more or less a "bad kid." Sergeant Fuentes testified that Salazar's demeanor reflected that she did not want to believe D.M. even before talking to her. Salazar believed that D.M. was making these allegations because Salazar had taken D.M.'s iPod away and because D.M. had recently found out that Appellant was not her biological father.

On the following day, Salazar contacted Sergeant Fuentes to advise him of a bullying problem that D.M. was going through at school, which she stated was directly connected to the outcry. Salazar had not mentioned anything about a bullying problem on the previous day. Sergeant Fuentes advised Salazar that a second forensic interview with D.M. would be conducted.

The second forensic interview was conducted on April 9, 2013. During this second interview, D.M. recanted her previous allegations against Appellant. D.M. stated that, on a Thursday, sixth graders at her school, Heather[2] and Gelisa, gave her a note during lunch threatening to kill her if she did not make up lies about Appellant.

---

[2]Salazar testified that Heather is D.M.'s biological father's wife's niece.

D.M. said that, prior to receiving the note, the students were in the hallway to go to the restroom when Heather threatened her and told her to "make up stuff about [Appellant]." Heather's friend then told D.M. that, if she did not comply, then D.M. was going to die. According to D.M., Heather and Gelisa told her to say that Appellant had been touching her. D.M. was not sure why they would tell her to make up things about Appellant, but she said that Heather does not like her. D.M. then stated that nobody had ever touched her anywhere before and that she "made up stuff, but [she] didn't mean to" during the first interview.

D.M. said that she talked to Salazar about her outcry and the bullying on Friday, the day after she gave her initial interview. Salazar then contacted the Children's Advocacy Center and Sergeant Fuentes. D.M. had not talked to Appellant since her outcry. D.M. stated that nobody told her what to say during her second interview and that she was being truthful.

Maez testified that recanting is very common in older children. She stated that a child may recant their initial outcry because they do not have familial support or because they are scared. Maez described D.M.'s demeanor in the second interview as "fidgety" and said that D.M. did not make eye contact and was inconsistent. Maez found D.M.'s demeanor to signal coaching or manipulation during this second interview. Additionally, D.M.'s teacher, Hawks, and the assistant principal at the school, Patricia Beard, both testified that fifth and sixth grade students did not have contact with one another during lunch. Hawks stated that they only had contact in passing on the way to class. However, Beard acknowledged it was possible for students to sneak out of class.

During trial, D.M. testified that she remembered her two interviews with Maez and that her second interview, during which she recanted her allegations, was the truth. She stated that she made the initial outcry because she was scared she was going to get hurt by some sixth grade girls. D.M. further testified that her mother

7

and grandmother did not tell her what to say and that Appellant has never touched or lain down with her.

Salazar testified that, on the Saturday following spring break, March 16, 2013, D.M. was in Odessa with D.M.'s aunt, Teresa Mata. Mata corroborated Salazar's testimony in this regard. Salazar stated that, during the two weekends following March 16, D.M. was in El Paso and in Glen Rose with Salazar, Appellant, and D.M.'s two sisters. However, Salazar did not have any documentation of the latter two trips. Salazar also testified that no one told D.M. to recant her allegations.

Appellant testified on his own behalf during the guilt/innocence phase. He denied ever lying in bed with D.M. or even sitting down on the bed with her. He stated that he generally leaves home at 8:00 a.m., gets off work around 7:30 p.m., and is home no later than 8:00 p.m. The family eats dinner around 8:00 p.m., and the kids are in bed no later than 10:00 p.m. Appellant is in bed by about 11:00 p.m. Appellant stated that, during the time between when he gets home from work and when he goes to bed, he usually stays in his boots and work clothes. Salazar and D.M. both testified that this was Appellant's routine. Other than a sixth-month period while Child Protective Services conducted an investigation, Appellant has lived in the home with D.M. the entire time since March 2013. Appellant testified that he spoke with D.M. once about what happened but did not tell her what to say. Appellant believed that D.M. made the outcry because of the girls bullying her at school.

We note at the outset that Appellant cites *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992), for the proposition that a reversal is required if the evidence gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence. The State directs our attention to the opinion of the Texarkana Court of Appeals in *Duke v. State* where the court addressed *Sanchez* and its "equal inference rule." 365 S.W.3d 722, 729 (Tex. App.—Texarkana 2012, pet. ref'd). In

reliance upon *Evans v. State*, 202 S.W.3d 158, 165 (Tex. Crim. App. 2006), our sister court rejected the equal inference rule. *Id.*; *see Goad v. State*, 354 S.W.3d 443, 449 n.2 (Tex. Crim. App. 2011) (Keller, P.J., concurring) (citing *Evans*). We agree with the Texarkana Court of Appeals that a reversal is not required if the evidence gives equal or near equal support to a theory of guilt and a theory of innocence. To the contrary, "when evidence 'gives rise to at least two, reasonably equal, plausible inferences . . . it is clearly the jury that makes the choice of which inference to accept.'" *Goad*, 354 S.W.3d at 449 n.2 (Keller, P.J., concurring) (quoting *Evans*, 202 S.W.3d at 165). The court in *Duke* additionally noted that the equal inference rule announced in *Sanchez* pertains to circumstantial evidence and that it has no application when there is direct evidence of guilt. 365 S.W.3d at 729. This case also contains direct evidence of guilt.

Appellant argues that D.M.'s initial interview and her statements during the sexual assault nurse examination provided insufficient evidence from which the jury could have convicted him for either crime. We disagree. D.M.'s initial interview, Maez's outcry testimony, and Doyle's testimony constituted sufficient evidence to support Appellant's convictions. "A child victim's outcry statement alone can be sufficient to sustain a conviction for a sexual offense." *Chavez v. State*, 324 S.W.3d 785, 788 (Tex. App.—Eastland 2010, no pet.) (citing *Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2016); *Tienda*, 479 S.W.3d at 873 (The testimony of the child victim alone is sufficient to support a conviction for a sexual offense.).

Appellant relies on D.M.'s recantation in her second interview and her testimony at trial to argue that her initial allegations are inconsistent with the rest of the evidence in this case. We are "required to defer to the jury's credibility and weight determinations because the jury is the **sole** judge of the witnesses' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899. It was the

jury's exclusive role to determine whether to believe the prior statements or the recantations. *Chavez*, 324 S.W.3d at 788 (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The jury had the opportunity to view both forensic interviews of D.M., as well as her in-court testimony. The jury was able to observe D.M.'s demeanor on each occasion in assessing D.M.'s credibility. The jury was entitled to reconcile the conflicts in her versions of what occurred, and it was free to disbelieve her recantation. *See Chambers*, 805 S.W.2d at 461.

The jury's decision to believe D.M.'s initial allegations is supported by evidence offered at trial. Maez testified that recantations are common with older children. She also provided possible reasons for recanting, such as a lack of familial support or fear. Additionally, evidence at trial showed that Appellant was the primary source of income for the household and that the family would struggle without his income. The jury was free to reject the evidence that other students pressured D.M. to make up the allegations. The jury was also free to reject Appellant's denial that the conduct occurred. Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found the essential elements of the alleged offenses beyond a reasonable doubt. Therefore, Appellant's two issues are overruled.

*This Court's Ruling*

We affirm the judgments of the trial court.

JOHN M. BAILEY

February 2, 2017 JUSTICE

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

10