

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00425-CR

———————————————————

JAMES JOE BRIDGEFARMER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1618320R

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I.  Introduction

Appellant James Joe Bridgefarmer appeals his convictions for eleven sexual offenses.  In three issues, Appellant challenges the sufficiency of the evidence to support his convictions and argues that the trial court erred by giving an extraneous-offense limiting instruction.  Because the record does not demonstrate that there was genital contact separate from penetration, we reverse the three convictions for indecency with a child by genital contact.  Because sufficient evidence supports the remaining convictions and because the trial court did not err by giving the extraneous-offense limiting instruction, we otherwise affirm.

## II.  Background

### A.    The Complainant's Testimony

The complainant, who was sixteen years old at the time of the trial, testified that her mother was previously married to Appellant.  The complainant said that she had lived with her mother and Appellant at an apartment complex on Mayfield Road when she was ten years old, had moved to a house that her uncle owned when she was fourteen or "about fourteen" years old, and had then moved to the Ridgetree Lane[1] apartment complex when she was fifteen years old.

---

[1]Several places in the record refer to the address for this apartment as Raintree Lane.  We utilize Ridgetree Lane because that was the address that was used for Appellant's warrant.

The complainant testified that the very first time that Appellant did anything inappropriate to her was at the Mayfield apartment when she was ten years old. The first incident happened in her room at night while her mother, the complainant presumed, was asleep in her own room. The complainant said that Appellant came into her room while she was half awake, laid down next to her, and touched her in her "lower area with his fingers." The complainant later clarified that when she said that Appellant had touched her "lower part," she was referring to her vagina and that he had touched the inside with his fingers. The complainant said that she did not know what had made him stop that night but that he had eventually left her room. The complainant testified that Appellant had penetrated her vagina with his fingers more than one time at the Mayfield apartment and that he had continued to do that up until they moved to the house her uncle owned. The complainant did not know how often Appellant had penetrated her vagina with his fingers at the Mayfield apartment because it was "so many." When the prosecutor tried to obtain an estimate, the complainant agreed that Appellant had penetrated her vagina with his fingers more than five times and "[m]aybe" more than ten times. The complainant said that Appellant had never said anything during the incidents and that she did not say anything because she was scared. The complainant kept her eyes closed during the incidents because she was afraid that if he had known she was awake, "he would [have] do[ne] something."

The complainant testified that at age fourteen when she and her mother and Appellant lived in the house that her uncle owned, Appellant started touching her breasts under her clothes in addition to penetrating her vagina with his fingers. The complainant said that Appellant had touched her breasts and had penetrated her vagina with his fingers more than once while they lived at that house.

When the complainant was fifteen and was living at the Ridgetree apartment, Appellant had touched her breasts and had penetrated her vagina with his fingers more than once. The complainant testified that the last incident occurred in April 2018 on the night before she made an outcry to her school counselor.

The complainant testified that Appellant did "those things" to her when she was ten or eleven and that he had continued as she had gotten older:

Q. Okay. And so State's Exhibit 34 [a photo], you said you were . . . ten or 11?

A. Yeah.

. . . .

Q. Okay. Do you remember all the stuff you've talked about that he would do to you, did he do that when you were this old in this picture?

A. Yes.

Q. And did he do it to you when you were this old in this picture, State's Exhibit 33?

A. Yes.

Q. And how old were you in State's Exhibit 33?

4

A. Ten or 11.

Q. Okay. And so did he do those things to you as you would get older?

A. Yes.

Q. When you turned 11?

A. Yes.

Q. And did he do those things when you turned 12?

A. Yes.

Q. And 13?

A. Yes.

Q. And then 14?

A. Yes.

Q. And he continued all the way up until you told?

A. Yes.

The complainant testified that during each incident, Appellant had smelled like smoke. The complainant stated that Appellant had kissed her on the neck but not on her mouth or her breast. The complainant said that Appellant had never taken off his clothes and that he had never removed her clothes. The complainant said that Appellant's actions made her feel "gross and ugly" and that she "wanted to be someone else."

The complainant said that she did not tell her mother because she and her mother did not get along well at that time and because she "was too afraid of

something happening." Instead, on April 16, 2018, the complainant told her school counselor that her stepfather was touching her inappropriately and that she "just wanted it to stop."

In response, the counselor called the police. When the police arrived, they asked the complainant some questions and then another officer took the complainant to the hospital for a physical exam.

After the outcry, the complainant went to live with her father. Approximately one week later, the complainant went to Alliance for Children and spoke to a forensic interviewer about what had happened to her.

### B.    The Outcry to the School Counselor

Di Warner, the school counselor, testified that she knew the complainant to be a sweet, kind, and happy girl based on their interactions at school. The complainant, however, did not have that demeanor when she approached Warner in April 2018 at school and requested a meeting.

Warner met with the complainant, who disclosed acts of sexual abuse. The complainant "referenced being touched inappropriately" by her stepfather.[2] Warner did not know the complainant's stepfather's name. Warner did not recall if she had asked the complainant any specifics about the touching.

---

[2]When Warner spoke with the district attorney's office on the phone two weeks before trial, she said that the perpetrator was "Grandfather." Warner admitted that she had trouble remembering which family member had assaulted the complainant.

6

Warner called Child Protective Services and law enforcement. In response, the school resource officer came and interviewed the complainant in Warner's office.

### C. Police Involvement

Officer Richard Morrison, an officer with the Arlington Police Department who was assigned to the school resource unit, testified that he was notified about a possible outcry and met with Warner and the complainant. The complainant told Officer Morrison that her stepfather had been "touching her inappropriately" with his hands. The complainant said that the touching had begun when she was ten years old and that the most recent incident had occurred the prior night (April 15, 2018). The complainant told Officer Morrison what she had worn to bed that night. Officer Morrison called for an officer to take the complainant to the hospital for a sexual assault evaluation, and he went to search the complainant's home.

### D. The Sexual Assault Examination

Melissa Cahill, a sexual assault nurse examiner (SANE) with John Peter Smith Hospital, testified that she had examined the complainant in April 2018. The complainant gave her birthday as December XX,[3] 2002, so she was fifteen years old at the time of the exam. The complainant said that her address was an apartment on Ridgetree Lane in Arlington. The complainant provided the name of her mother and

---

[3]To protect the complainant's identity, we obscure the day of her birth. The charges in the indictment were calculated using her birthday, so we also obscure the day of her birth when discussing the charges in the indictment.

her stepfather and said that they lived with her. The complainant told Cahill that the person who had assaulted her was her stepfather, who was in his forties.

Cahill testified that she took down the complainant's statement verbatim and read the following during her testimony:

> Patient states, I think I was ten years old when it started. It was always at night. He would come in my room and lay down in the bed with me. He would put his hand under my panties and put his fingers in my vagina. I laid there and pretended to be asleep because I was scared. He never said anything to me. This would happen for a while, and then he would stop for a while. I don't know how many times it happened.
>
> The last time it happened was last night. He did the same thing. He came in my room and laid down[;] then he put his hand in my panties and put his fingers in my vagina. He also lifted my shirt and put his mouth around here (indicating). At that point, she indicates chest and breast area.

The complainant said that the last incident had occurred on the bed in her room on the night of April 15, 2018. The complainant told Cahill that "it had happened multiple times." The complainant "admitted to masturbation of herself per the assailant, which meant her stepfather [had] masturbated her . . . which is digital penetration or finger penetration of her vaginal area" and had licked or kissed her ear and her breast. The complainant was awake but pretended to be sleeping when this happened.

During the physical exam, Cahill completed a sexual assault kit by taking swabs from various body parts on the complainant.

8

### E.    The Police Investigation

Based on the information that the complainant had provided, Officer Morrison went to her home to collect her bedding, a black pair of baggy gym shorts, and a pair of blue underwear. When Appellant arrived at the home, Officer Morrison spoke with him. Officer Morrison told Appellant about the outcry, and Appellant responded by retrieving a cigarette and talking about traffic. A detective with the Arlington Police Department obtained a DNA sample from Appellant.

### F.    The Forensic Evidence

Kara Tillman, a forensic biologist with the Tarrant County Medical Examiner's Office, tested the sexual assault kit connected to this case. Tillman testified that the complainant's vulvar and perianal swabs were both positive for P30, the prostate-specific antigen, which is a strong indicator of seminal fluid from a vasectomized male. Tillman tested the underwear and found that the lower crotch was positive for the prostate-specific antigen. The gym shorts tested negative for the acid phosphatase, so Tillman did not proceed to the P30 testing on them.

Heather Kramer, a senior forensic biologist with the Tarrant County Medical Examiner's Office, testified that she had performed DNA testing on several items in this case. Kramer testified that she had a buccal swab from Appellant; using that known sample, Kramer deduced a male DNA profile that was the same as Appellant's

9

at twenty locations[4] on the epithelial fraction of the underwear. Kramer testified that the expected frequency of occurrence in selecting an unrelated individual with that same DNA profile among Caucasians on the epithelial fraction of the underwear cutting would be "one in 2.0 nonillion Caucasians."

Once Kramer removed the epithelial fraction from the underwear cutting, she treated what was left with a second round of heat and an even stronger chemical that would break open sperm cells, if present; she explained that this constituted the second fraction. On the second fraction of the underwear cutting, there was a mixture of DNA: the major male contributor at twenty locations was the same as Appellant. Kramer testified that the expected frequency of occurrence in selecting an unrelated individual with that same DNA profile among Caucasians on the second fraction of the underwear cutting was one in 175.3 octillion Caucasians.

After further testing on the male DNA on the breast swab, there was a partial profile that was the same as Appellant's. Additional testing on the epithelial fraction of the vulvar swab revealed three DNA types, but they were below the threshold for comparison and were ruled to be inconclusive.

---

[4]Kramer testified that she tested twenty-one locations and that one location was inconclusive.

## G.    The Forensic Interviewer

Lindsey Dula from Alliance for Children testified about forensic interviews generally and about how children remember when something happened.[5]    Dula testified that when something happens continuously, "some of those details will kind of blend together. . . .    When you're talking about something that happened repeatedly, repeatedly, repeatedly and it's the same thing every time, maybe something doesn't necessarily stand out, but you understand what has happened and so that's what you'll talk about."

## H.    The Verdict

After hearing the evidence, the jury found Appellant guilty of continuous sexual abuse of a child (Count One),[6] four counts of indecency with a child by touching the complainant's breast (Counts Four, Seven, Ten, and Thirteen), three counts of aggravated sexual assault of a child by digital penetration (Counts Five, Eight, and Eleven), and three counts of indecency with a child by genital contact (Counts Six, Nine, and Twelve).

## III.  Sufficiency Challenges

In his first and second issues, Appellant argues that the evidence is insufficient to support his convictions.    Throughout Appellant's sufficiency complaints, he

---

[5]Dula said that one of her coworkers had conducted the complainant's forensic interview, but that coworker was on maternity leave at the time of the trial.

[6]The jury charge instructed the jury not to consider the lesser-included offenses in Count Two and Count Three if the jury found Appellant guilty on Count One.

challenges the lack of specificity in the testimony and the use of the pronoun "it." As explained below, we resolve this complaint against Appellant after reading the record as a whole. We then analyze his sufficiency challenges, concluding that (1) the evidence is insufficient to support his convictions for indecency with a child by genital contact because there was no evidence of touching the complainant's vagina separate from the evidence of penetration, and (2) sufficient evidence supports his remaining convictions.

## A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

12

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## B. Applicable Law

A person commits the offense of continuous sexual abuse of a child if (1) during a period that is thirty or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims, and (2) at the time of the commission of each of the acts of sexual abuse, the actor is seventeen years of age or older and the victim is a child younger than fourteen years of age, regardless of whether the actor knows the age of the victim at the time of the offense. Tex. Penal Code Ann. § 21.02(b). An "act of sexual abuse" includes aggravated sexual assault or indecency with a child if the actor committed the offense in a manner other than by touching the breast of a child. *Id.* § 21.02(c)(2), (4).

A person commits the offense of indecency if, with a child younger than seventeen years of age, the person engages in sexual contact with the child or causes the child to engage in sexual contact. *Id.* § 21.11(a)(1).

13

## C.      Clarity of the Testimony

As a preliminary matter, we address the complaint that is woven throughout Appellant's sufficiency challenges—that "much of the testimony about [his] conduct [was] non-specific.  The pronoun 'it' appears rather often.  More specifically, it appears in the prosecutors['] questions for [the complainant] too often to allow an understanding of the frequency of [the] conduct."  The record reflects that the prosecutors, as well as defense counsel, frequently used "it" to refer to various sexual conduct.  But beginning before the portion of the record that Appellant complains of, the prosecutor made clear the type of sexual conduct that was being discussed, as well as the timing of when that conduct had occurred:

> Q.  And then you move into your uncle's house, you said you were how old?
>
> A.  Fourteen.
>
> Q.  Okay.  When you move into your uncle's house, did he -- you said he changed up.  He started *touching your breasts*?
>
> A.  Yes.
>
> Q.  Did he ever *touch your breasts* at the first apartment?
>
> A.  No.
>
> Q.  Okay.  When you were in the -- in the house [owned by] your uncle, tell me, did he do that more than one time, *touching your breasts*?
>
> A.  Yes.
>
> Q.  And tell me what he would do at your uncle's house?

14

A.  He would touch me and -- on my vagina and touch me on my breasts.

Q.  Would he touch you over your clothes *on your breast* or under your clothes?

A.  Underneath.

Q.  Would he touch you over the clothes or under the clothes on your private part, *on your vagina*?

A.  Underneath.

Q.  What about at the [Mayfield] apartments when he first started doing that, was that over the clothes or under the clothes?

A.  Under.

Q.  Was it always under the clothes or did he start doing it over the clothes?

A.  It was underneath.

Q.  Always?

A.  Yes.

Q.  And did he do that more than one time at your uncle's house?

A.  Yes.

Q.  When you moved out of your uncle's house and moved into th[e] . . . Ridgetree Apartments . . . , you would have been how old do you think?

A.  Fifteen.

Q.  Okay.  And would he do the same things there or something different?

A.  Same things.

Q. Okay. And was there a -- times that you remember at this apartment at Ridgetree that he would *touch your breast* under your clothes?

A. Yes.

Q. Did he do that more than one time?

A. Yes.

Q. Do you remember if he ever *touched your vagina* under the clothes at this apartment?

A. Yes.

Q. Did he do that more than one time?

A. Yes.

Q. Going back just for a second, if we can . . . to the very first apartment [the Mayfield apartment]. When you were ten, 11, 12[,] and 13, do you -- can you give me an idea of about how many times do you think that he did that to you?

A. I really don't know how many times.

Q. Because it was so many?

A. Yes.

Q. Would you say that it was more than ten times?

A. Maybe.

Q. All right. Would you say it's more than five times?

A. Yes. [Emphases added.]

Additionally, the jury had before it the SANE's testimony that the complainant had told her on the day of the outcry that her stepfather had "put his fingers in [her]

16

vagina" and that "her stepfather [had] masturbated her . . . which is digital penetration or finger penetration of her vaginal area."

From the testimony, it is apparent that the only act that occurred during the duration of the time that the complainant lived at the Mayfield apartment was Appellant's penetration of the complainant's vagina with his fingers. It is also apparent from the testimony that after the complainant moved to the house owned by her uncle, Appellant's conduct changed to include both penetration of the complainant's vagina with his fingers and touching her breast. Both types of sexual contact continued after the move to the Ridgetree apartment.

Viewing the record as a whole, we conclude that the evidence about Appellant's conduct was specific and that it did not prevent the jury, as the factfinder, from understanding the frequency of the sexual abuse. We therefore overrule Appellant's argument that the record lacks clarity regarding the type and frequency of his sexual conduct toward the complainant.

### D.    Sufficiency Analysis of Counts Four through Thirteen

In his first issue, Appellant argues that the evidence is insufficient to support his convictions for Counts Four through Thirteen. Of those ten counts, three of the counts are for indecency with a child by genital contact, four of the counts are for indecency with a child by touching the complainant's breast, and the remaining three counts are for aggravated sexual assault of a child by digital penetration. Of these three categories of offenses, the State addresses only the indecency counts that

involved touching the complainant's breast and the counts of aggravated sexual assault of a child by digital penetration. We therefore begin our analysis with the counts for indecency with a child by genital contact that were omitted from the analysis in the State's brief.

### 1. Counts Alleging Indecency with a Child by Genital Contact

Count Six alleged that Appellant had committed the offense of indecency with a child by genital contact on or about December XX, 2016, which would have been while the complainant was fourteen or "about fourteen" and was living in the house her uncle owned. The complainant testified that Appellant had touched (i.e., penetrated) the inside of her vagina with his fingers at the Mayfield apartment when she was ages ten to thirteen. The complainant testified that when she was about fourteen, they moved to the house owned by her uncle, and "[h]e did *the same thing. But he changed it kind of. He started touching my breasts.*" [Emphasis added.] The complainant's testimony reveals that Appellant penetrated her vagina with his fingers while she was living at the house owned by her uncle.

Count Nine alleged that Appellant had committed the offense of indecency with a child by genital contact on or about December XX, 2017, which would have been while the complainant was fifteen and was living at the Ridgetree apartment. The State asked the complainant if Appellant did the same things at that apartment as what he did at her uncle's house or something different, and the complainant responded, "Same things."

Count Twelve alleged that Appellant had committed the offense of indecency with a child by genital contact on or about April 15, 2018, which was the night before the outcry while the complainant was still living at the Ridgetree apartment. Thus, her "[s]ame things" response applies to this offense, showing that Appellant penetrated her vagina with his fingers the night before the outcry. Additionally, the complainant told the SANE that Appellant had masturbated her, thus confirming that there was penetration.

Although the attorneys at trial often imprecisely referred to Appellant's conduct as "touching the vagina," the record in this case does not show an occasion during the assaults when there was genital contact separate from the penetration. Because Appellant was also charged for aggravated sexual assault of a child by digital penetration on each of the dates alleged in Counts Six, Nine, and Twelve, the genital contact (i.e., touching of the complainant's vagina) on each of those dates was incident to and subsumed by the aggravated sexual assault by penetration that occurred on those dates. *See Aekins v. State*, 447 S.W.3d 270, 281 (Tex. Crim. App. 2014) ("In short, in Texas, as in many other jurisdictions, a defendant may not be convicted for a completed sexual assault by penetration and also for conduct (such as exposure or contact) that is demonstrably and inextricably part of that single sexual assault."); *Rodriguez v. State*, No. 04-11-00809-CR, 2012 WL 6013426, at *4–5 (Tex. App.—San Antonio Nov. 30, 2012, pet. ref'd) (mem. op., not designated for publication) (reversing five convictions for indecency by contact that were subsumed

within five convictions for sexual assault by digital penetration); *see also Radilla-Esquivel v. State*, No. 03-14-00544-CR, 2016 WL 4978565, at *10 (Tex. App.—Austin Sept. 16, 2016, pet. ref'd) (mem. op., not designated for publication) ("This is not a case where appellant was charged with and convicted of indecency by contact *and* aggravated sexual assault for *each* time the evidence showed he penetrated [the complainant's] anus or sexual organ. If that had been the case, the aggravated-assault conviction would have subsumed the indecency-by-contact conviction." (citing *Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004), and *Barnes v. State*, 165 S.W.3d 75, 88 (Tex. App.—Austin 2005, no pet.))).

Accordingly, we hold that the evidence is insufficient to support Counts Six, Nine, and Twelve. *See Cosio v. State*, 318 S.W.3d 917, 921 (Tex. App.—Corpus Christi–Edinburg 2010) (en banc) (op. on reh'g) (holding evidence insufficient to support one count of indecency with a child by contact because the testimony was too imprecise for the trier of fact to reasonably infer that the appellant had touched the complainant's genital area on that occasion, apart from the contact incident to penetration that the complainant had also described), *rev'd on other grounds*, 353 S.W.3d 766 (Tex. Crim. App. 2011). We sustain Appellant's first issue in part as to his convictions on Counts Six, Nine, and Twelve.

### 2. The Remaining Counts

Count Four charged Appellant with indecency with a child by touching the complainant's breast on or about December XX, 2015 (the complainant's thirteenth

20

birthday). The complainant testified that Appellant had started touching her breasts when they lived at the house her uncle owned and that she was fourteen or "about fourteen" when she lived there. The complainant further testified that Appellant had touched her breasts more than once when she lived at that house. Viewing all the evidence in the light most favorable to the verdict, a rational factfinder could have found the crime's essential elements beyond a reasonable doubt because the State was not required to prove the exact date alleged in the indictment. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. *See generally Wright v. State*, 28 S.W.3d 526, 532 (Tex. Crim. App. 2000) ("It is well settled that the 'on or about' language of an indictment allows the [S]tate to prove a date other than the one alleged as long as the date proven is anterior to the presentment of the indictment and within the statutory limitation period.").

Counts Five and Seven charged Appellant with aggravated sexual assault of a child by penetration and indecency with a child by touching the complainant's breast on or about December XX, 2016. As set forth above, the complainant testified that Appellant had touched her breasts and had penetrated her vagina with his fingers when she was fourteen and was living at the house her uncle owned. Viewing all the evidence in the light most favorable to the verdict, a rational factfinder could have found the essential elements of the crimes in Counts Five and Seven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Garcia v. State*, 592 S.W.3d 590, 598–99 (Tex. App.—Eastland 2019, no pet.) ("It is . . . well settled that the uncorroborated testimony of a child victim alone can be sufficient to support a

21

conviction of aggravated sexual assault of a child and of indecency with a child by contact." (citing *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978), and *Tienda v. State*, 479 S.W.3d 863, 873 (Tex. App.—Eastland 2015, no pet.))).

Counts Eight and Ten charged Appellant with aggravated sexual assault of a child by penetration and indecency with a child by touching the complainant's breast on or about December XX, 2017. The complainant testified that more than once Appellant had touched her breasts and had penetrated her vagina with his fingers when she was fifteen years old and was living at the Ridgetree apartments. Viewing all the evidence in the light most favorable to the verdict, a rational factfinder could have found the essential elements of the crimes in Counts Eight and Ten beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Garcia*, 592 S.W.3d at 598–99.

Counts Eleven and Thirteen charged Appellant with aggravated sexual assault of a child by penetration and indecency with a child by touching the complainant's breast on or about April 15, 2018. The complainant and the SANE testified regarding the events that had occurred on April 15, 2018—the night before the outcry—including that Appellant had touched the complainant's breasts and had masturbated her. Additionally, the evidence demonstrates that Appellant's DNA was found on the crotch of the complainant's underwear. Viewing all the evidence in the light most favorable to the verdict, a rational factfinder could have found the essential elements

of the crimes in Counts Eleven and Thirteen beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Garcia*, 592 S.W.3d at 598–99.

Because we hold that the evidence is sufficient to support Appellant's convictions on Counts Four, Five, Seven, Eight, Ten, Eleven, and Thirteen, we overrule the remainder of Appellant's first issue.

### E. Sufficient Evidence Supports Count One

In his second issue, Appellant argues that the evidence is insufficient to support his conviction on Count One for continuous sexual abuse.

The indictment alleged in Count One that

> JAMES JOE BRIDGEFARMER, HEREINAFTER CALLED DEFENDANT, IN THE COUNTY OF TARRANT, STATE OF TEXAS, ON OR ABOUT THE [XX] DAY OF DECEMBER 2012 THROUGH THE [XX] DAY OF DECEMBER 2016, DID INTENTIONALLY OR KNOWINGLY, DURING A PERIOD OF TIME THAT IS 30 DAYS OR MORE IN DURATION, COMMIT TWO OR MORE ACTS OF SEXUAL ABUSE, NAMELY: AGGRAVATED SEXUAL ASSAULT OF A CHILD UNDER 14 BY CAUSING THE PENETRATION OF THE SEXUAL ORGAN OF [THE COMPLAINANT] BY INSERTING HIS FINGER INTO THE SEXUAL ORGAN OF [THE COMPLAINANT], AND/OR INDECENCY WITH A CHILD BY TOUCHING ANY PART OF THE GENITALS OF [THE COMPLAINANT], AND AT THE TIME OF THE COMMISSION OF EACH OF THESE ACTS OF SEXUAL ABUSE THE DEFENDANT WAS 17 YEARS OF AGE OR OLDER AND [THE COMPLAINANT] WAS YOUNGER THAN 14 YEARS OF AGE[.]

Here, Appellant does not challenge the evidence supporting the age element— that he was seventeen years of age or older; his argument is that the testimony is "so vague as to leave the jurors wondering what acts were actually committed" and

23

"whether the incidents occurred over the requisite [thirty]-day period." As explained above, although there are numerous references to "it" and "that" by both the prosecutor and defense counsel during their direct and cross-examination of the complainant, the testimony when reviewed as a whole does not leave doubts as to what conduct occurred or to the location where the conduct occurred, and the locations where the complainant lived were tied to certain ages.

The complainant testified that when she was ten, eleven, twelve, and thirteen and lived at the Mayfield apartment, Appellant had penetrated her vagina with his fingers more than five times and that she did not know how many times it had happened because there were so many instances. Nothing about the complainant's testimony suggests that the acts of sexual abuse were of a limited duration or had occurred within a narrow window of time.

Moreover, although the complainant's testimony may have lacked actual dates, other than the incident that occurred the night prior to the outcry, the evidence showed that the complainant's birthday is December XX, 2002, so a rational factfinder could have determined that the sexual abuse that had occurred at the Mayfield apartment when she was ages ten to thirteen would have occurred during the time frame set forth in the indictment—on or about December XX, 2012, to December XX, 2016. And based on the complainant's description of the type of incidents that had occurred and their frequency, a rational factfinder could have found

beyond a reasonable doubt that during a thirty-day period or longer, Appellant had committed two or more acts of sexual abuse against the complainant.

We therefore hold that the evidence is sufficient to support Appellant's Count One conviction for continuous sexual abuse of a child. *See Brown v. State*, No. 03-16-00011-CR, 2017 WL 876029, at *4–5 (Tex. App.—Austin Feb. 28, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that evidence of continuous sexual abuse of a child was sufficient because it established that the abuse had started shortly after the child had moved in with appellant's mother in July 2011, the last act had occurred shortly before the appellant had moved in with someone else in October 2011, and that "numerous acts of sexual assault" and indecency were committed by appellant); *Machado v. State*, No. 02-15-00365-CR, 2016 WL 3962731, at *3 (Tex. App.—Fort Worth July 21, 2016, pet. ref'd) (mem. op., not designated for publication) (acknowledging that most of the evidence was weak concerning when the sexual abuse had occurred but holding that the record "contain[ed] evidentiary puzzle pieces that the jury could have carefully fit together" to determine that sexual abuse had occurred over a period of thirty or more days).  Accordingly, we overrule Appellant's second issue.

## IV.  Extraneous-Offense Limiting Instruction

In his third issue, Appellant argues that the trial court erred by giving an extraneous-offense limiting instruction to the jury.  We interpret Appellant's argument to complain that all the evidence presented at trial went to one of the alleged counts;

thus, there was no evidence of extraneous offenses and therefore no need for an extraneous-offense instruction.

## A. The Standard of Review and the Jury's Unanimity Requirement on a Continuous-Sexual-Abuse-of-a-Young-Child Charge

The review of an alleged jury charge error in a criminal trial is a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, an appellate court must determine whether there was error in the jury charge. *Id.* Then, if there is charge error, the court must determine whether there is sufficient harm to require reversal. *Id.* at 731–32. The standard for determining whether there is sufficient harm to require reversal depends on whether the appellant objected to the error at trial. *Id.* at 732.

If the appellant objected to the error, the appellate court must reverse the trial court's judgment if the error is "calculated to injure the rights of [the] defendant." Tex. Code Crim. Proc. Ann. art. 36.19. This means no more than that there must be some harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

The law setting forth the offense of continuous sexual abuse of a young child states that

> [i]f a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

26

Tex. Penal Code Ann. § 21.02(d).

## B. Limiting Instruction and Trial Objection

The jury charge included the following limiting instruction on extraneous offenses:

> The [S]tate has introduced evidence of extraneous crimes or bad acts other than the ones charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, in determining the state of mind of the defendant and the child and the previous and subsequent relationship between the defendant and the child. You cannot consider the testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other crimes or bad acts, if any were committed.

During the charge conference, Appellant's counsel stated, "On page 8 of the [j]ury [c]harge, the third full paragraph about introduction of extraneous crimes or bad acts, I don't believe there have been any introduction of any other extraneouses."[7]

The trial court responded,

> Well, since the testimony is there was an unlimited number of offenses for a five[-]year period of time, it's to address each of those additional alleged offenses that are not included in these 13 counts to show the relationship between the victim and the defendant. So that request is denied.

---

[7]The State points out that "although defense counsel did not use the word 'objection,' she did voice her belief that the limiting instruction was inappropriate" and that this should be construed as an objection for purposes of assessing the proper harm analysis to apply.

27

## C.    Analysis

Here, Appellant argues that "[n]one of the incidents qualify as extraneous offenses." Appellant contends that "any of the conduct the jury heard about could have been the basis for the convictions of the non[]continuous sexual abuse offenses." As explained below, we disagree with Appellant's contention that there was no evidence of extraneous crimes or bad acts that necessitated an extraneous-offense limiting instruction.

First, the record demonstrates more instances of sexual abuse than those that were alleged. For example, the complainant testified that Appellant had penetrated her vagina with his fingers more than five times and "[m]aybe" more than ten times when she lived at the apartment on Mayfield. All of these aggravated sexual assaults occurred during the time frame associated with the continuous sexual abuse charge alleged in Count One of the indictment, but the jury needed only two incidents that occurred over thirty days or more to find Appellant guilty of that offense. Moreover, the jury was not required to agree unanimously on which specific acts of sexual abuse were committed by Appellant or the exact date when those acts were committed. *See id.* Because there was evidence of more than two aggravated sexual assaults that occurred over thirty days or more, the record contains evidence of extraneous crimes.

Second, the record also contains evidence that can be construed as bad acts. The complainant testified that Appellant had kissed her on her neck, and she told the SANE that Appellant had licked or kissed her ear and her breast.

Because we hold that the record contains evidence of extraneous crimes and bad acts, we proceed to analyze whether the trial court erred by including the extraneous-offense limiting instruction over Appellant's objection. As explained by the Waco Court of Appeals,

> A trial judge must—without any request or objections from the parties—prepare a charge that accurately sets out the law applicable to the charged offense. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); Tex. Code Crim. Proc. [Ann.] art. 36.14. The trial court is not required to include a limiting instruction in the jury charge when no instruction was requested at the time the evidence was admitted. *Delgado*, 235 S.W.3d at 254. [Appellant] did not request a limiting instruction pursuant to Rule 404(b) of the Rules of Evidence at the time that evidence of possible extraneous offenses was admitted; thus, this evidence was admissible for all purposes. *See id.* But [Appellant] has not cited, nor have we found, any cases holding that a trial court is prohibited from including a limiting instruction in such a situation.
>
> Instead, the Court of Criminal Appeals long ago considered and rejected an argument that the trial court reversibly erred by including a limiting instruction regarding extraneous offenses in the jury charge over the appellant's objection in *Fair v. State.*

*Steggall v. State*, No. 10-17-00017-CR, 2018 WL 3763747, at *2 (Tex. App.—Waco Aug. 8, 2018, pet. ref'd) (mem. op., not designated for publication).

The Dallas Court of Appeals summarized *Fair* and its progeny as follows:

> In *Fair v. State*, 465 S.W.2d 753, 754–55 (Tex. Crim. App. 1971), the defendant argued that the trial court erred in overruling his objection to a limiting instruction in the charge concerning extraneous offenses because the extraneous offenses had not been proven. The court of criminal appeals concluded that it was not necessary to give the limiting instruction because the evidence was admissible to prove the main issues of intent and motive. *Id.* at 455. But the court also concluded that "[t]he charge given was not harmful but beneficial to the appellant" and there was no reversible error. *Id.* Additionally, in *Jasso v. State*, 699

29

S.W.2d 658, 662 (Tex. App.—San Antonio 1985, no pet.), the defendant charged with rape of a child argued that the trial court erred in giving a limiting instruction concerning an extraneous offense. The court concluded,

> Appellant has cited no case and we have found none that holds that the giving of an instruction favorable to the accused, such as a limiting instruction on the use of extraneous offenses constitutes reversible error. We believe there can be none because a benefit to the accused cannot be the basis for complaint.

*Id.* Here, as in *Fair* and *Jasso*, the limiting instruction regarding extraneous offenses at the second punishment trial "was not harmful but beneficial to the appellant." *Fair*, 465 S.W.2d at 455. As a result, and regardless of whether there was error, we conclude there was no reversible error.

*Miller v. State*, No. 05-14-01355-CR, 2017 WL 34585, at *4 (Tex. App.—Dallas Jan. 4, 2017, no pet.) (mem. op., not designated for publication); *see also Steggall*, 2018 WL 3763747, at *2; *Ferreira v. State*, 514 S.W.3d 297, 301–02 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Esparza v. State*, 513 S.W.3d 643, 648–49 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Sadler v. State*, No. 01-14-00422-CR, 2015 WL 5136857, at *5–6 (Tex. App.—Houston [1st Dist.] Aug. 28, 2015, no pet.) (mem. op., not designated for publication).

We agree with this line of cases and therefore hold that regardless of whether there was error, the trial court did not commit reversible error by including the extraneous-offense limiting instruction in the charge. *See Steggall*, 2018 WL 3763747, at *2; *Miller*, 2017 WL 34585, at *4; *Ferreira*, 514 S.W.3d at 301–02; *Esparza*, 513

S.W.3d at 649; *Sadler*, 2015 WL 5136857, at *6. Accordingly, we overrule Appellant's third issue.

## V. Conclusion

Having sustained a portion of Appellant's first issue challenging the sufficiency of the evidence, we reverse the judgments on Counts Six, Nine, and Twelve for the convictions of indecency with a child by genital contact, and we acquit Appellant of those charges. Having overruled the remainder of Appellant's first issue, as well as his second and third issues, we affirm the trial court's judgments on Counts One, Four, Five, Seven, Eight, Ten, Eleven, and Thirteen.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 10, 2020