

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

————————————————————

No. 02-25-00035-CR

————————————————————

GENE ANTHONY TUTT A/K/A GENE ANTHONY TUTT JR., Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 485th District Court
Tarrant County, Texas
Trial Court No. 1855891

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

Appellant Gene Anthony Tutt appeals his convictions and sentences for aggravated assault with a deadly weapon[1] and occlusion assault,[2] enhanced by two prior felony convictions. *See* Tex. Penal Code Ann. § 12.42(d).[3] In his three appellate points, Tutt complains of the admission of hearsay statements made by the complainant, Delia,[4] and challenges the sufficiency of the evidence linking him to the two prior convictions. We will affirm.

---

[1]*See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, 1973 Tex. Gen. Laws 883, 919, *amended by* Act of May 25, 2021, 87th Leg., R.S., ch. 461, §§ 1, 2, Tex. Gen. Laws 908, 908–10 (current version at Tex. Penal Code Ann. § 22.01) (defining assault); Tex. Penal Code Ann. § 22.02(a)(2) ("A person commits an offense if the person commits assault as defined in § 22.01 and the person . . . uses or exhibits a deadly weapon during the commission of the assault.").

[2]*See* Act of May 25, 2009, 81st Leg., R.S., ch. 427, § 1, 2009 Tex. Gen. Laws 1022 (current version at Tex. Penal Code Ann. § 22.01(b)(2)(B)) (amending Subsection (b)(2) of the assault statute to make assault a third-degree felony if the offense is committed against a member of the defendant's family or household or against a person with whom the defendant has or has had a dating relationship and "the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth").

[3]Texas Penal Code Section 12.42(d) has been amended since Tutt's trial. *See* Act of June 1, 2025, S.B. 1610, 89th Leg., R.S., ch. 1145, § 1. The amendments in no way impact our analysis or disposition of Tutt's appeal.

[4]Although they were both adults at the time of the offenses, we will refer to the complainant and her daughter using aliases to protect the complainant's privacy. *See* *Upchurch v. State*, 656 S.W.3d 170, 174 n.1 (Tex. App.—Fort Worth 2022, no pet.).

# I. BACKGROUND

## A. PRETRIAL FACTS

At 7:30 a.m. on June 14, 2022, Delia sent a text to her daughter Tanya.[5] Concerned, Tanya called 911. She explained to the 911 operator that the day before Delia had called her from a "random number" and told her that "some guy" who was living with her had stabbed her with a knife. Delia had also claimed that the man had taken her phone, which was why she was calling Tanya from a neighbor's phone. Tanya could hear a girl's voice on the phone saying, "Your momma's bleedin'. She got cut all on her arm and stuff from the guy." Tanya further told the 911 operator that she had called Delia back that night and that Delia had said that she was "not fine" but that "he was still there."

While on the phone with the 911 operator, Tanya drove over to Delia's apartment. She did not want to go inside the apartment but waited outside for the police. When two officers arrived, Tanya was on the phone with Delia. Upon hearing a scream, one of the officers kicked down the door to the apartment. The officers saw Tutt and Delia in the living room.[6]

---

[5]The text read, "He w[o]n[']t let me leave to go to work. Plz come get me out this house plz.. I'm scared . . . that he might hurt me."

[6]One of the officers testified at trial that when she entered the apartment, "[i]t looked like [Tutt] was trying to go towards the patio door."

The officers subdued and arrested Tutt, and one of the officers spoke with Delia once she was separated from Tutt. The officer noticed that Delia had cuts on her arm. Delia told the officer that Tutt had "choked" her and cut her arm.

Tutt was charged with one count of aggravated assault and one count of occlusion assault. In a habitual-offender notice, the indictment alleged that Tutt had previously been convicted of two felonies in Platte County, Missouri.

## B. TRIAL

At trial, Officer Laura Mendoza of the Fort Worth Police Department testified that she was the second officer to arrive on scene at Delia's apartment on June 14, 2022. After entering the apartment and restraining Tutt with the other officer, Officer Mendoza spoke with Delia in a bedroom. She testified that Delia "seem[ed] scared" and was crying. Over Tutt's objection, Officer Mendoza was allowed to testify that Delia had told her that Tutt had "cut her arm" and "choked her." Photographs taken at the scene and depicting Delia's injuries were admitted into evidence without objection. Officer Mendoza further testified that Delia's wounds appeared fresh but "were not actively bleeding."

Delia testified that she had met Tutt while she was working as a security officer and that their relationship had "started off as a friendship" but then turned romantic. She explained that he "was very kind to [her] in the beginning" and that he had his own lawn-service business. But he also displayed jealousy and, on one occasion, "got really mad" and called her "trash" for talking to one of his workers. She testified that

4

at first she and Tutt "had little arguments" but that "it wasn't to the point where . . . anything got physical."

That changed on June 13, 2022. Tutt and Delia had gone to the laundromat to wash clothes.[7] While in the car, they got into "a verbal argument" over money. Delia admitted taking a swing at Tutt but denied that she had "come in contact with him." From the laundromat, they drove to "the hair store."[8] According to Delia, she was driving, and Tutt asked for the keys to the car. She testified that she took the keys out of the ignition and "put them on the floor" of the car and "that's when he got mad. And he slapped [her and] ripped [her] shirt." She said that he had never hit her before. She responded by ripping his shirt.

Delia claimed that she then got out of the car and that Tutt "jumped over in[to] the driver's seat." She stated that he "locked the passenger door" but that a back door to the car was still unlocked. She opened it before he could lock her out of the car and told him that she "just want[ed] to go back home." Delia testified that Tutt then drove her back to the apartment, where they sat down to talk about what had just happened. She recalled getting up at one point and going to the door. She testified that when she opened the door, "he got up and [said], [']Where you going?[']"

_____

[7]Tutt does not dispute this fact, although the witnesses he called in his defense offered a dramatically different account than Tamara's of what occurred at the laundromat.

[8]Based on the testimony of another witness, it appears that this was a beauty-supply store.

She responded that she was "not going anywhere," and he began pushing her. She started "walking back, asking, [']What are you doing?[']" She testified that things got "crazy" and that she "end[ed] up by the bathroom in the hallway," where "he grabbed [her] around [her] neck from behind and began to choke" her. Delia described how Tutt had stood behind her and "choked" her with one arm. She stated that he put "a lot of pressure" on her neck, that it was hard for her to breathe, and that she thought that she was "going to die." She said that "it felt like [he did this for] a real[ly] long time" but that it probably lasted "10, 15 seconds maybe."

Delia testified that while Tutt was choking her he was saying, "Tell me you love me," and "Do you love me?" She explained to the jury that she was unable to respond, which frustrated him further. She testified that she then "felt . . . a sharp object in [her] back" and, after that, "a sharp object across [her] face." She thought that Tutt was cutting her with a steak knife. She testified that after she felt the knife across her face, Tutt cut her arm "[t]hree times . . . [d]own by [her] wrist" and that he kept saying, "Tell me you love me." She averred that she "was scared for [her] life." Delia identified more photos of her injuries, which were also admitted into evidence without objection.

Delia explained that at the time of the assault Tutt had been staying with her at her apartment but that he had another residence that he could have gone home to. She came up with a plan to get out of her apartment. She testified that once "things had . . . calmed down" she asked him if he had a few dollars and proposed that she

6

leave the apartment to go buy some marijuana "because [they] both smoked marijuana at the time." They pooled their money, and Delia left the apartment and went "to the weed man['s] house." She did not take her phone with her because she "didn't want [Tutt] to know that [she] was going to call somebody."

Delia testified that no one answered when she knocked on the door at "the weed man['s] house" but that "while [she] was standing there knocking on the door, two young ladies pulled up." She asked to use their phone and called Tanya. She told Tanya what had happened but did not want her to come over at the time because she did not want Tanya to be put in harm's way. Eventually, "the weed man . . . pulled up," and Delia was able to purchase marijuana and return to her apartment. She said that "[t]hings were . . . calmed down and stuff" that night and that she and Tutt went to bed after having smoked marijuana.

Delia was scheduled to go to work the next morning. She testified that Tutt did not want her to go to work for fear that she "might drop his trash."[9] Scared, she waited until Tutt went to the bathroom and then texted Tanya. Delia authenticated the text message that she had sent Tanya at 7:30 a.m. on June 14, 2022. A copy of the text message—and Tanya's response, "I'll come by"—was admitted into evidence without objection, as was the recording of Tanya's 911 call.

---

[9]Delia clarified that he was worried about people seeing the cuts on her arm and her "saying something."

Delia explained that she was in the shower when Tanya and the police arrived. She testified that she got out of the shower and went to the door without putting any clothes on. She saw Tanya and the police through the peephole. Tanya wanted her to open the door; Tutt did not. Delia tried to get dressed. She testified that the police told her "to say[, ']Help[,'] and they would bust down the door." She claimed that she "was a little hesitant" but "eventually" complied, "[a]nd that's when the[ police] came in."

Delia recalled talking to "a lady officer" in the back bedroom of the apartment. Delia testified that she was crying at the time because she "was so scared" and "was dealing with a lot of fear." She also testified that Tanya was angry, yelling, and screaming at Tutt.

Delia further testified that as she was cleaning up her apartment the following week, she "found three . . . knives down in [her] couch" that she recognized as being from her kitchen. She denied that she had put the knives there.

After the State rested, Tutt called his niece and his sister as witnesses. The niece, Divonni, testified that she and her older brother had gone with Tutt and Delia to the laundromat on June 13, 2022. She recalled that Tutt and Delia had gotten "into an argument or altercation while [they] were [all] in the truck." Divonni also recalled that, after they had washed their clothes, they left the laundromat to go "cut some yards." She stated that they worked until "around 8:00" that night and then stopped by a beauty-supply store, where Tutt and Delia "started arguing again." Divonni

8

claimed to have seen Delia hit Tutt at both the laundromat and the beauty-supply store. She testified that nobody ever actually got out of the truck at the beauty-supply store and that they all wound up going back to "their apartment." Divonni testified that at the apartment Tutt and Delia "started arguing again"; she testified that she saw Delia "come out [of] the back room," go into the kitchen, and then "hurr[y] . . . back to the back room." According to Divonni, Tutt and Delia then came out of the room, and Delia "lunge[d] at" Tutt with something in her hand. Divonni testified that the situation finally calmed down when she and her brother were about to leave. She said that she did not see any injuries on anybody when she and her brother left.

Tutt's sister, Dekisha, recalled that Divonni had called her on the morning of June 13, 2022 about "some commotion going on." Dekisha testified that although she was concerned by what she heard, she thought that if the situation had been "bad enough, [then] someone else would have called 911." She further testified that she went to "the apartment" that evening to pick up her son and daughter. Dekisha claimed that she "knew of" Delia but had never met her before that night. She recalled having had a conversation with both Tutt and Delia and that Delia did not seem to be upset at the time. Dekisha also testified that she "did not see any injuries" or blood on Delia but that Delia had something that "looked like a knife" in her hand. She asked Delia "if she was okay," and Delia "said she was okay. She didn't want to go nowhere. She was fine."

9

The jury found Tutt guilty on both counts of the indictment. At the trial on punishment, over Tutt's objections, the trial court admitted court documents that purported to show that Tutt had previously been charged with and convicted of the felony offenses of burglary and unlawful possession of a firearm in Platte County, Missouri.[10] Both sides called several witnesses at the punishment phase. The jury found the habitual offender notice true and assessed Tutt's punishment at 38 years in prison on each count. The trial court sentenced Tutt accordingly, and Tutt appealed.

## II. ANALYSIS

In his first point, Tutt argues that the trial court erred by allowing Officer Mendoza to testify, over Tutt's hearsay objection, to what Delia had told her. In his other two points, he argues that the evidence was insufficient "to support a rational finding" that he was linked to the two prior convictions from Missouri. For the reasons explained below, we overrule his points.

### A. TUTT'S FIRST POINT: HEARSAY TESTIMONY

Tutt contends that Delia's statements to Officer Mendoza about his choking her and cutting her arm are hearsay and should not have been admitted.[11] The State

---

[10]State's Exhibits 82 and 85 are copies of the felony informations charging Tutt, and State's Exhibits 83 and 86 are copies of the judgments reflecting his convictions and sentences. The informations identify the defendant charged therein as "GENE A. TUTT," while the judgments identify him as "GENE A TUTT JR."

[11]"Hearsay" means a statement that (1) the declarant does not make while testifying at the current trial or hearing and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Tex. R. Evid. 801(d). Hearsay is not

10

responds that the statements were admissible under the "excited utterance" exception to the rule against hearsay.[12]  But the State also argues that Tutt forfeited any error in the admission of these statements by failing to secure a record of the bench conference that transpired in between Tutt's objecting and the trial court's ruling on the objection.  We examine the State's forfeiture argument first.[13]

### 1.  Tutt preserved this point for our review.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling.  Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021).  Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule.  Tex. R. App. P. 33.1(a)(2); *Dixon*, 595 S.W.3d at 223.

Here, when the State asked Officer Mendoza, "And what did [Delia] tell you had occurred?" Tutt's trial counsel immediately stated, "I'm going to object to that. Hearsay."  The trial court asked the State for its response, and the prosecutor stated,

---

admissible unless otherwise provided by a statute or other rules prescribed under statutory authority.  Tex. R. Evid. 802.

[12]"A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," is not excluded by the rule against hearsay.  Tex. R. Evid. 803(2).

[13]Because error preservation is a systemic requirement, we have a duty to ensure that a claim is properly preserved in the trial court before we address its merits. *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020).

"Excited utterance, Judge. She's in a clearly emotional state after an assault and she is giving information to the officer in an ongoing emergency." The trial court then asked Tutt's trial counsel if she had "any response to the State's response," and Tutt's counsel proceeded to take the witness on voir dire without making any additional objections or arguments. After Tutt's counsel had an opportunity to question the witness, the trial court invited the State to ask "follow-up questions," and the following transpired:

> Q. Did you have any information before the victim started talking to you where you knew when the assault happened or were you just trying to get all of the information at that time?
>
> A. At that time we were just trying to gather the information.
>
> Q. Okay. Had she told you when the assault occurred at that time?
>
> A. Not at that time.
>
> Q. Okay.
>
> THE COURT: Y'all approach.
>
> Everything here is off the record.
>
> (At the bench, off the record.)
>
> (At the conclusion of the bench conference, the trial continued in open court as follows:)
>
> THE COURT: All right. I'm going to overrule the objection at this time as to statements that would qualify as excited utterance, but -- and I'll make it running, but I will also reconsider the objection if the scope goes beyond what the law allows.
>
> BY [THE STATE]: Thank you, Judge. May I proceed?

THE COURT:  Yes, you may.

Officer Mendoza then testified, in response to further questioning by the State:

> Q.  When you go into the back bedroom, is [Delia] crying?
>
> A.  Yes.
>
> Q.  And do you notice anything -- any injuries on her?
>
> A.  Yes.
>
> Q.  Okay. What do you notice?
>
> A.  She had cuts on her arm.
>
> Q.  Okay. Did she tell you about that at first or did you just notice them?
>
> A.  I noticed them.
>
> Q.  And did you ask her about them?
>
> A.  Yes.
>
> Q.  And what did she tell you?
>
> A.  That he cut her arm yesterday.
>
> Q.  Okay. And what else did she tell you happened kind of in the same incident with the cutting?
>
> A.  That he choked her

The State contends that "it appears that given the possibility of an off-the-record proffer [supporting its excited-utterance contention], [Tutt] forfeited appellate review by failing to provide a bill of exceptions explaining what that proffer was." We disagree.  We do not need to know what proffer, if any, the State made off the record.

The State asked the witness a question that called for hearsay testimony, and Tutt, through his trial counsel, timely objected. It then became the State's burden as the proponent of the evidence to establish its admissibility. *See Bahena v. State*, 634 S.W.3d 923, 927 (Tex. Crim. App. 2021).

It is apparent from the context of the record we have that the trial court understood both Tutt's objection—"Hearsay"—and the State's response—that the hearsay it sought to elicit from Officer Mendoza was admissible under the excited-utterance exception to the hearsay rule. *See* Tex. R. App. P. 33.1(a)(1)(A) (requiring that the objection "state[] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context"). Preservation does not require "magic language" but turns only on whether the trial court understood the basis of the objection. *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016); *State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013). Here, the trial court apparently did. Additionally, Tutt preserved this complaint for appeal by securing an adverse ruling and a running objection from the trial court. *See Ford v. State*, 919 S.W.2d 107, 113–14 (Tex. Crim. App. 1996) (holding that "trial court clearly understood [appellant's] complaint and ruled adversely thereon" where appellant made a timely and specific objection and trial court responded, "All right. I note your objection. I'll grant your running objection on the issue and overrule it.").

14

We thus turn to the merits of Tutt's first point—although we will ultimately conclude that it has no merit.

## 2. Standard of Review

We review a trial court's ruling to admit or exclude evidence for an abuse of discretion and will not reverse that ruling absent a clear abuse of discretion. *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024); *Bautista v. State*, 189 S.W.3d 365, 368 (Tex. App.—Fort Worth 2006, pet. ref'd). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and we will uphold it. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

## 3. Delia's Statements Were Admissible as Excited Utterances.

Tutt contends that Delia's "out-of-court statements of how she received her injuries" were not excited utterances.[14] The State counters that "the trial court acted within its [discretion] in determining the statements constituted excited utterances." Here, we agree with the State.

"No single rigid principle governs the admissibility of statements under the excited[-]utterance rule." *Couchman v. State*, 3 S.W.3d 155, 159 (Tex. App.—Fort

---

[14]Tutt makes additional contentions, supported by authority, explaining why the statements were not admissible under other exceptions to the rule against hearsay. Because we determine that the statements were admissible under the excited-utterance exception, we need not address Tutt's other contentions. *See* Tex. R. App. P. 47.1.

15

Worth 1999, pet. ref'd). Although "the court may consider the time elapsed . . . , it is not dispositive that the statement . . . was separated by a period of time from the startling event"; that is just one of multiple "factors to consider in determining whether the statement is admissible under the excited[-]utterance hearsay exception." *Davis v. State*, 268 S.W.3d 683, 703 (Tex. App.—Fort Worth 2008, pet. ref'd); *see Zuliani v. State,* 97 S.W.3d 589, 595–96 (Tex. Crim. App. 2003). "A useful rule of thumb is that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." *Apolinar v. State*, 155 S.W.3d 184, 189 (Tex. Crim. App. 2005) (quoting 2 John W. Strong, *McCormick on Evidence* § 272, 207–08 (5th ed. 1999)). Testimony that the declarant still appeared "nervous" or "distraught" and that there was a reasonable basis for continuing emotional upset will often suffice. *Id.*

And the startling event or condition that triggers an excited utterance need not necessarily be the crime itself. *Couchman*, 3 S.W.3d at 159; *see also McCarty v. State*, 257 S.W.3d 238, 239–40 (Tex. Crim. App. 2008) (recognizing that "under the excited-utterance exception, the startling event may trigger a spontaneous statement that relates to a *much earlier* incident"). The excited utterance need only "relat[e] to [the] startling event or condition." Tex. R. Evid. 803(2). The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" at the time of the statement. *Zuliani,* 97 S.W.3d at 596. Stated

16

differently, a reviewing court must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Id.* (quoting *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)).

Officer Mendoza testified that when she spoke with Delia in the back bedroom, Delia "seem[ed] scared" and was crying. Delia's statements to Officer Mendoza that Tutt had "cut her arm" and "choked her" were related to the startling assault she had experienced the day before. The trial court was within its discretion to find that Delia was still under the stress of excitement caused by the assault when she made these statements to Officer Mendoza. *See Zuliani,* 97 S.W.3d at 596 (holding that statement of "scared to death" declarant was admissible as excited utterance even though time between startling event and declarant's statement was twenty hours); *Davis,* 268 S.W.3d at 703–04 (upholding trial court's admission of testifying officer's recitation of declarant's hearsay statement under excited-utterance exception where declarant was "clearly upset," her hands were shaking badly, and she was crying even though record did not indicate what period of time had elapsed between startling event and declarant's statement); *Martinez v. State*, No. 2-02-356-CR, 2004 WL 254233, at *5 (Tex. App.—Fort Worth Feb. 12, 2004, pet. dism'd) (mem. op., not designated for publication) (reasoning that a declarant "was likely still dominated by the emotion, excitement, fear, or pain" of the assault that had occurred "approximately twenty hours before [the declarant] told [a witness] what had happened," even though the

17

declarant had gotten away from her assailant, where the evidence showed "that [the declarant] was kept in a constant state of fear of [the assailant] from the time of the assault until [she] spoke with [the witness]"); *Reagan v. State*, No. 2-03-050-CR, 2003 WL 22966260, at *2–3 (Tex. App.—Fort Worth Dec. 18, 2003, no pet.) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion in admitting officer's testimony regarding declarant's oral statements under excited-utterance exception where officer observed that declarant "was visibly shaken, tearful, and upset"); *Jackson v. State,* 110 S.W.3d 626, 634 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that the statements of a recently assaulted, "very upset," and crying assault victim were excited utterances).

Further, the trial court could have reasonably found that Delia made these excited utterances to Officer Mendoza while still under the stress of excitement caused by the events that had just transpired that morning. *See Couchman*, 3 S.W.3d at 159–60 (rejecting the appellant's argument that the child complainant's statements were inadmissible as excited utterances because they were "too far removed from the original [offense]" where "the startling condition that evoked [the child complainant]'s statements could have been the [extant] pain she was experiencing" in her genitals and she was still "scared, crying[,] and upset" when she made the statements about the abuse). Officer Mendoza described Tanya's demeanor outside the apartment as "frantic" and testified that Tanya "was yelling and saying . . . [t]hat [Tutt] was not letting [Delia] out of the apartment." Officer Mendoza also testified that Tanya was

18

kicking the apartment door and that the other officer on scene kicked down the door after hearing a scream. She further testified that the scene inside the apartment was chaotic; she described "a struggle" in which Tutt resisted the police's attempts to detain him, did "not listen[] to verbal commands," and at one point reached towards his waistband. Also, according to Officer Mendoza, Tanya continued yelling once inside the apartment.

The trial court thus had evidence before it that Delia had made the statements about her injuries to Officer Mendoza in the immediate aftermath of a chaotic situation in which (1) Tutt, who had just assaulted her the day before, was preventing her from leaving her apartment; (2) her daughter was outside yelling and kicking the door; (3) the police then broke down the door; (4) Tutt physically resisted when the officers tried to restrain him; and (5) Tanya added to the stress and excitement of the situation by continuing to yell.

Tutt cites two of our sister courts' cases, *Tienda v. State*, 479 S.W.3d 863 (Tex. App.—Eastland 2015, no pet.), and *Sandoval v. State*, 409 S.W.3d 259 (Tex. App.—Austin 2013, no pet.), on this point, but neither case supports his argument.

In *Tienda*, an indecency-with-a-child case, a detective interviewed the complainant "a couple of months" after the appellant had allegedly sexually assaulted her. 479 S.W.3d at 874. At trial, the detective testified that the complainant became emotional at times during the interview and that he had to stop the interview a couple of times because the complainant began to cry. *Id.* The trial court admitted a seven-

19

minute portion of the complainant's recorded interview under the excited-utterance exception to the hearsay rule. *Id.* On appeal, the Eleventh Court of Appeals noted that "[i]n the admitted portion of the interview, [the detective] asked approximately twenty-six questions, several of which were leading." *Id.* at 876. The court went on to examine how the complainant initially appeared to answer questions calmly and that even when she became emotional, she still paused for long periods before answering, which indicated that her statements were not spontaneous. *Id.* at 876–78. The court ruled that, "[w]hile her responses were obviously emotional, they were not spontaneous enough to avoid the possibility of fabrication as required by *McCarty*." *Id.* at 878; *see McCarty*, 257 S.W.3d at 241. Ultimately, the *Tienda* court held that the trial court had abused its discretion when it admitted the complainant's statements as excited utterances. *Tienda*, 479 S.W.3d at 877, 878.

And in *Sandoval*, a sexual-assault-of-a-child case, the complainant's cousin was allowed to testify that after the appellant's name had come up in conversation, the complainant commented that "she didn't like him (appellant)" and asked her cousin, "Can I tell you something?" 409 S.W.3d at 285. According to the cousin, the complainant expressed that "she was scared to tell anybody" but eventually disclosed that one night earlier that year, the appellant had forced her to have sexual intercourse with him. *Id.* at 271, 285. The cousin further testified that she knew that the complainant was upset because the complainant's "voice . . . was shaky" and tears were coming down the complainant's face. *Id.* at 285. The Third Court of Appeals

concluded that the complainant's disclosure of the assault to her cousin did not qualify as an excited utterance. *Id.* at 285–86. The court acknowledged that "there [wa]s no question that [the complainant] was emotional when she told her cousin about the assault" and that "the original assault was undoubtedly shocking" but held that "the record d[id] not support that [the complainant] was still, three or four months later, dominated by the excited state produced by the attack. Nor d[id] the record reflect that the mention of [the] appellant's name was the type of startling or shocking event contemplated by the excited-utterance rule." *Id.* The *Sandoval* court described the complainant's disclosure to her cousin as "a narrative of a painful event, not an excited utterance." *Id.* at 286.

*Tienda* and *Sandoval* are distinguishable from this case. Delia's statements to Officer Mendoza about what Tutt had done to her were not made months after the assault or as part of a lengthy police interview. There was no testimony or other evidence that she paused and contemplated her answer to Officer Mendoza's question. The record reflects that her statements that Tutt had "cut her arm" and "choked her" resulted from impulse rather than reason and reflection. *See Zuliani,* 97 S.W.3d at 596; *Fowler,* 379 S.W.2d at 347. We hold that the trial court's determination that these statements were admissible under the excited-utterance exception was within the zone of reasonable disagreement and therefore not an abuse of discretion. We overrule Tutt's first point.

## B. TUTT'S SECOND AND THIRD POINTS: FELONY-ENHANCEMENT EVIDENCE

In Tutt's second and third points, he argues that "[t]he evidence was legally insufficient to support a rational true finding that the prior felony conviction in question admitted for enhancement purposes was linked to [him]."[15] In reviewing the sufficiency of the evidence to support a finding that an enhancement is "true,"[16] we consider all the evidence in the light most favorable to the trial court's finding and determine whether a rational trier of fact could have found the essential elements beyond a reasonable doubt. *Wood v. State*, 486 S.W.3d 583, 589 (Tex. Crim. App. 2016).

To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists and (2) the defendant is linked to that conviction. *Henry v. State*, 509 S.W.3d 915, 918 (Tex. Crim. App. 2016); *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). "No specific document or mode of proof is required to prove these two elements." *Flowers*,

---

[15]Tutt briefs these as two separate points but makes the same contentions and cites the same authority as his argument for both. To aid in our analysis, we will consolidate our review of his second and third points.

[16]In his brief, Tutt mentions that he objected to the admission of the certified court documents from Missouri based on "relevance," and he refers to the trial court's "error in admitting the prior convictions to support the habitual offender notice." Although Tutt does not explicitly argue that the trial court abused its discretion by admitting these exhibits, our analysis and disposition of his second and third points would effectively be the same because "the relevance of a prior conviction is conditioned upon the production of evidence sufficient to show that the defendants are one and the same." *Davis*, 268 S.W.3d at 715.

220 S.W.3d at 921. One example of acceptable evidence is "documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted." *Id.* at 921–22. But "[r]egardless of the type of evidentiary puzzle pieces the State offers to establish the existence of a prior conviction and its link to a specific defendant, the trier of fact determines if these pieces fit together sufficiently to complete the puzzle." *Id.* at 923. If the elements that a prior conviction exists and that the defendant is linked to that conviction can be found beyond a reasonable doubt, then the various pieces used to complete the puzzle are necessarily legally sufficient to prove a prior conviction. *Id.*

Tutt contends that the testimony and documentary evidence in the record is not sufficient to tie him to the prior felony convictions. He points out that "[t]here are no fingerprints, nor a photograph of him, and also no testimony from someone with personal knowledge that [he] was convicted" as alleged in the habitual-offender notice.

We rejected an argument similar to Tutt's in *Gonzales v. State*, No. 02-23-00311-CR, 2024 WL 3529620 (Tex. App.—Fort Worth July 25, 2024, no pet.) (mem. op., not designated for publication). In *Gonzales*, we noted that "we and many of our sister courts have held that the appearance of a defendant's name and unique Texas identification number on a certified judgment can sufficiently link a defendant to a prior conviction." *Id.* at *2–3 (collecting cases). And we held likewise in *Gonzales*, ruling that a certified judgment reflecting both the defendant's name and his unique

23

state identification number, "standing alone, sufficed to link Gonzales to the prior conviction." *Id.*

Here, there were a few more puzzle pieces for the jury to fit together; thus we similarly conclude that a rational factfinder could have found beyond a reasonable doubt that Tutt was linked to the two prior Missouri convictions. Although the convictions and informations from the two Missouri cases did not contain fingerprints, they contained another unique identifier—Tutt's social security number. Tutt's name, date of birth, and social security number appear on both Missouri judgments. Those same pieces of identifying information also appear on Tutt's Tarrant County Jail registration form.[17] A redacted partial copy of the registration form was admitted into evidence for all purposes.[18] On the redated copy, several

---

[17]We note here that one of our sister courts has held that a reasonable factfinder could conclude that the defendant was the person convicted of (1) a prior offense where he was linked to a certified copy of an out-of-state judgment against him by a felony complaint bearing the same cause number and depicting his birthdate and social security number and (2) another prior offense where he was linked to a certified copy of a Missouri judgment by just his name and birthdate but the "social security number on the paperwork . . . was one number off from" his social security number. *See Barnes v. State*, 585 S.W.3d 643, 650 (Tex. App.—Texarkana 2019), *rev'd on other grounds*, No. PD-1072-19, 2021 WL 476483 (Tex. Crim. App. Feb. 10, 2021).

[18]An unredacted copy of the same pages from Tutt's registration form was admitted for the record only.

more pieces of identifying information can be seen, including Tutt's race, sex, address, height, weight, eye color, hair color, marital status, and United States citizenship.[19]

The redacted copy also displays a thumb print and CID number. Tarrant County Sheriff's office Corporal Homer Carnero testified that "CID stands for the County Identification Number. It's a unique and permanent number that's given to someone being put into the crime records in Tarrant County. [And] what makes it unique is [that Tarrant County] attach[es] fingerprints to that number."[20] The same CID number—along with the same name, date of birth, race, sex, height, and weight—appeared on a certified copy of a "ten-print card"[21] that was also admitted into evidence for all purposes. Corporal Carnero testified that he had personally taken Tutt's inked prints "[a] little over an hour" before testifying, that he had compared the prints from the ten-print card to the ones he had just taken, and that

---

[19]The redacted copy also shows that Tutt has an "Identification Number" associated with Missouri. However, that number does not appear in State's Exhibits 82, 83, 85, or 86.

[20]Corporal Carnero testified that fingerprints are unique to individuals.

[21]We have previously noted that Corporal Carnero has testified that a ten-print card is a card that contains an "arrestee's identifying information, name, date of birth, [and] sometimes . . . the [fact of] arrest . . . , along with the roll prints." *Morgan v. State*, No. 02-19-00374-CR, 2020 WL 5949917, at *2 n.1 (Tex. App.—Fort Worth Oct. 8, 2020, no pet.) (mem. op., not designated for publication). The roll prints are taken during the booking process and for the fingerprints "are fingertip to fingertip each digit of each hand, and [for the palm prints are] just pat-down [palm prints], and that happens during the booking process." *Id.*

the two sets of prints matched. He also testified that the thumb print on the registration form matched the corresponding thumb print on the ten-print card.

The State thus linked Tutt to the prior Missouri convictions via his unique social security number and his Tarrant County CID number used in both Missouri and Tarrant County and linked to that same social security number and his inked prints.[22] We hold that this evidence supported a rational finding that Tutt was the same person convicted of the two felony offenses that the State used as punishment enhancements, and we overrule his second and third points. *Cf. Flowers,* 220 S.W.3d at 924–25 (holding that a certified copy of a computer printout from the Dallas County Clerk and a copy of the appellant's driver's license record were sufficient to link a prior DWI to the appellant where the computer printout listed a prior DWI conviction and contained personal descriptors, such as the date of birth, address, and social security number, that matched the personal descriptors contained in the appellant's driver's license record); *Gonzales,* 2024 WL 3529620, at *3; *Johnson v. State,* 665 S.W.3d 902, 905 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (holding "that orders and judgments of convictions containing a Texas state identification number, coupled with testimony that the number is 'unique' to a defendant's criminal record, provide[ a] sufficient basis for the fact finder to link the defendant to prior

---

[22]Additionally, we note that the State elicited testimony on cross-examination of Tutt's sister that she and Tutt had previously lived in Missouri for 18 years. The State was also allowed to introduce evidence that, during the booking process at Tarrant County Jail, Tutt admitted that he had "spent time in prison."

convictions for purposes of proving a defendant's criminal history under [Texas Code of Criminal Procedure] Article 37.07, § 3(a)(1)").

### III.  CONCLUSION

Having overruled Tutt's three points, we affirm the judgments of the trial court.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 23, 2026